**John C. GREEN, Petitioner,**

**v.**

**Otis LOGGINS, Respondent.**

**No. C–77–1702 RFP.**

United States District Court, N. D. California.

June 30, 1978.

Thomas S. Worthington, Houde & Worthington, Salinas, Cal., for petitioner Green.

Evelle J. Younger, Atty. Gen., Ann K. Jensen, Deputy Atty. Gen., San Francisco, Cal., for respondent Otis Loggins.

PECKHAM, Chief Judge.

The petitioner, John C. Green, was convicted of second degree murder in 1975. He contends, as he did in the state courts, that his conviction violated due process because the in-court identification of one of the state's witnesses, David Terry, was tainted by an impermissibly suggestive pretrial confrontation between that witness and Green. For the reasons stated below, we agree that it was error to allow that identification testimony, and we further find that the error was not harmless beyond a reasonable doubt. Therefore, the petition for a writ of habeas corpus is granted.

## I

On July 13, 1975, Edward Hunter, the proprietor of "Eddie's Place" in Salinas, California, was shot to death at approximately 2:30 a. m. One of the persons present in the restaurant at the time of the shooting, David Terry, told investigating officers that he had seen someone enter Eddie's with a weapon. Terry therefore was shown a photographic display consisting of 19 pictures and asked if any of them were of the person he had seen. Included in the array were two pictures of Green, one of which was a polaroid snapshot of the petitioner lying in a hospital bed.[1] Terry, however, picked out the photograph of a Mr. Hightower as looking like the man with the gun. This identification was made several hours after the shooting occurred. (RT 472–76.)

Shortly after this interview with the police, Terry, a seaman, disappeared. Approximately three months later and only three days prior to the scheduled trial date of October 20, 1975, he reappeared in Salinas, and the police, who had been searching for him, immediately took him into custody. They then notified the district attorney who in turn informed defense counsel that Terry had been located. That same day both attorneys met with Judge Agliano, and it was agreed that under the circumstances the defense was entitled to a lineup pursuant to *Evans v. Superior Court*, 11 Cal.3d 617, 625, 114 Cal.Rptr. 121, 126, 522 P.2d 681, 686 (1974) (due process requires that the accused be afforded a pretrial lineup when the request therefor is timely made and "there exists a reasonable likelihood of a mistaken identification which a lineup would tend to resolve."). Pursuant to this agreement a lineup was scheduled for the following week. It also was agreed that

the district attorney would insure that no photos of the defendant would be shown to Terry prior to the lineup.

No lineup was held, however, because of an "accidental" confrontation between Green and Terry on October 19. Sometime on the morning of the 19th, Terry went to the jail seeking protective custody. Because he smelled of alcohol, the police obliged him by booking him as drunk in public. Terry then was placed in a holding cell and fell asleep there. On that same morning, the defendant spent some time conferring with his attorney. This meeting concluded during the time that lunch was being served to the inmates on Green's floor. Consequently, pursuant to jail policy that there be no movement in or out of cells during feeding time, Green was placed in the detention cell, with Terry, to have lunch and to await return to his own cell.

Terry's version of the ensuing confrontation was as follows: When he woke up he saw another man in the cell whom he recognized as Green. No other people were in the cell at that time.[2] Terry remained in the cell approximately an hour and a half during which time he had lunch with Green. He started to tell Green who he was but then he "changed my first name [to John] and I gave him my last name." He did this because "I wasn't supposed to be there and I got to testify against him." (Aug. RT 108.) Terry testified that Green responded, "[N]o, you are the one that is going to testify against me." *Id.* Terry remained with Green until shortly after lunch, at which time he asked to be let out. He estimated that he had been in the cell with Green from one hour to an hour and a half.

Except for his opinion as to when Terry recognized him, Green's testimony about the meeting is consistent with Terry's but

---

1. This picture was taken at the hospital where Green had been taken by police who responded to his telephone call for help. At the time he was picked up, Green told the police that he had been shot while walking down a street. He later stated, and testified at trial, that he was in Eddie's at the time of the shooting and was wounded by a stray bullet.

2. The California Court of Appeals noted that Terry was placed in a cell with six other men and this may have been a factor in their decision that the "setting" was not impermissibly suggestive. While there were other men in the cell when Terry was placed there, Terry testified that Green was the only other person in the cell when he, Terry, woke up. (Augmented (Aug.) RT 107.)

far more detailed. Green stated that before lunch was brought, the two of them engaged in some limited conversation, primarily regarding what Terry was in jail for and when he would be released. After lunch one of the jail officials, an Officer Gary, said something to the effect, "Green, are you ready to go back upstairs." (RT 530.) According to Green, Terry then appeared to become frightened and went to the front of the cell and told the officer that he wanted to make a phone call. Terry then began pacing back and forth. He was allowed to make the phone call but received no answer. He then asked to be and was released. Prior to his release, however, Green asked him what his name was, and Terry responded, "James." In response to the officer's question as to what his name was, Terry responded, "John Wayne." When the officer responded, "What do you mean?" Terry answered "Terry." Green then asked him his name again and Terry responded, "John Terry."

Deputy Gary Deaton, who was the desk officer at the jail on October 19, also testified at the suppression hearing, which was held the day before the trial began. Terry already was in the detention cell when Deaton came on duty at 8:00 a. m. The previous watch informed him that the man in the booking cell was a 647 F (drunk in public) and that "he was a state witness and he was to remain there to be released whenever they called his attorney and I believe the attorney was supposed to come and pick him up." (Aug. RT 61.) Deaton was not told in what case Terry was a witness.

Officer Deaton's testimony regarding his questions to Terry and the telephone request is similar in some but not all respects to Green's. The relevant portions of this testimony are as follows:

THE COURT: When did you first become aware that Green had been placed in the same cell with Terry?

A. Well, I had an occasion to walk out to the booking cell and I knew that there were some of the 647 F's, the drunks that had not been released and I wasn't sure of his name and I walked out there and asked him his name.

Q. What name did he give?

A. He gave me Terry.

. . . . .

Q. Did he identify himself as John Wayne or the like?

A. I don't believe so. He didn't give me a first name. He identified himself I think to Mr. Green as John, he used I believe the name John Terry.

. . . . .

If I can clarify myself, when I asked him his name all he gave me was his last name and I believe when he gave me his last name Mr. Green said, what was your name again, and then I think he said Terry and then I can't be sure but Mr. Green asked him what was your first name and I think he said John.

Q. What happened after that, if anything?

A. I am not sure if I released him right away or not. I noticed a hesitation when I asked Terry his name and he didn't respond immediately.

Q. All right.

A. But, it didn't dawn on me right then why.

Q. All right. Did it become apparent at some other time why this hesitation.

A. Yes, as I was releasing Mr. Terry he asked me why I had done that and I inquired what did he mean why had I done that and he said, well, you put me in there with him, and, you know, asked me my name and then I went further and I said, well, what difference does that make, and he said, well, you know, he is the man I am testifying against, and that is the first knowledge that I had of that.

. . . . .

Q. Do you remember making a phone call for Terry on that date, Mr. Terry?

A. I remember him—I didn't give him one, I remember him calling the party that was supposed to come and get him and didn't answer and I asked him if he wanted to go ahead and get cut loose anyway and he said yes. (Aug. RT 58–60.)

In light of this confrontation, the lineup was cancelled.

## II

 The question before us is whether under the totality of the circumstances the jailhouse confrontation was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). *See also Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The fact that this confrontation was "accidental" is not determinative of the petitioner's due process claim. "[I]t is always necessary to 'scrutinize *any* pretrial confrontation.'" *Kirby v. Illinois*, 406 U.S. 682, 690, 92 S.Ct. 1877, 1883, 32 L.Ed.2d 411 (1972) (quoting *United States v. Wade*, 388 U.S. 218, 227, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (emphasis added by *Kirby* Court). *Accord, United States v. Colclough*, 549 F.2d 937, 942 (4th Cir. 1977) (accidental confrontation case); *United States ex rel. Ragazzini v. Brierley*, 321 F.Supp. 440, 443 (W.D.Pa.1970) ("Not merely a lineup but any pretrial confrontation must be scrutinized for its fairness. [citing *Wade*] That a pretrial confrontation is unintentionally unfair or even accidental in its occurrence does not render it immune from constitutional infirmity.")[3] Nevertheless, defendants rarely prevail where the confrontation was accidental, primarily because of the difficulty of establishing "unnecessary," *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), or "impermis-

sible," *Simmons, supra*, 390 U.S. at 384, 88 S.Ct. 967, suggestiveness.

Unlike an "arranged" showup, an accidental confrontation usually gives no indication to the witness that "this is the man." For example, in *United States v. Massaro*, 544 F.2d 547 (1st Cir. 1976), *cert. denied*, 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977), the court found a courtroom hallway confrontation to be

> pure happenstance without suggestive circumstances. The two men with Massaro were United States Marshals, but all three men wore street clothes. It is true that the Marshals each wore jackets while Massaro did not; but they had on no badges, there were no handcuffs, and Massaro was not held by the arms, i. e., there was no evidence of custody.

*Id.* at 550. Similarly, the court's finding in *Colclough, supra*, that the accidental confrontation there did not violate due process was based largely upon the fact that

> there was nothing about Sullivan's appearance or condition at the time of the out-of-court confrontation, such as being handcuffed or in prison garb, to suggest that he was a defendant in a criminal prosecution.

*Id.* at 941–42.

The instant case, however, is unlike *Massaro, Colclough* or other similar cases where the confrontation is "neither avoidable, unfair, nor suggestive." *Allen v. Moore*, 453 F.2d 970, 974 (4th Cir.), *cert. denied*, 406 U.S. 969, 92 S.Ct. 2422, 32 L.Ed.2d 688 (1972). Here both the unfairness (though not necessarily in a constitutional sense) and the avoidability of the jailhouse confrontation arise from the fact that the police had total control over both parties, yet they created the confrontation as a result of what might well be described as gross negli-

---

**3.** An accused, however, is not denied his Sixth Amendment right to counsel by an accidental confrontation even if it occurs after the initiation of "judicial criminal proceedings." *United States v. Jackson*, 448 F.2d 963, 967 (9th Cir. 1971) ("In our view, however, the teaching of those cases [*Wade* and *Gilbert*] does not apply

to an inadvertent pretrial confrontation of the kind which took place in this case.") *See also United States v. Conner*, 149 U.S.App.D.C. 192, 462 F.2d 296, 297 (1972). At trial Green's attorney advanced a Sixth Amendment claim but that since has been abandoned.

gence.[4] Furthermore, the circumstances of the confrontation clearly suggested that Green "was a defendant in a criminal prosecution," and the mention of Green's name identified him as the suspect in the Hunter killing.[5] A more suggestive "accidental" confrontation is difficult to imagine.

■ Unnecessary suggestiveness alone, however, does not violate due process. *Neil v. Biggers, supra,* 409 U.S. at 199, 93 S.Ct. 375. "[T]he reliability of the identification [is] the guiding factor in the admissibility of both pretrial and in-court identifications." *Manson v. Brathwaite,* 432 U.S. 98, 106 n.9, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977).

> The factors to be considered are set out in *Biggers,* 409 U.S. [188], at 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Id.* at 114, 97 S.Ct. at 2253. Analysis of these factors in the instant case will be facilitated by first stating the basic sequence of events that Terry sketched out at the suppression hearing and that he amplified upon at the trial.

Terry and all of the other witnesses generally agreed that at the time of the shooting, Eddie's Place was full (one person estimated 20 to 25 people). The crowd was mostly male and it was mostly black, as are Green and Terry. People were talking and the jukebox was playing. Estimates of the noise level ranged from loud to very loud. The evidence, including Green's own testimony, also established that Green entered Eddie's Place sometime after two o'clock in the morning of July 13, and that he proceeded to the pool table, which was used for shooting dice, in the back of the restaurant. Shortly thereafter, a police car pulled up outside, and Hunter, the victim, approached the pool table and told everyone to pick up their money.

Green testified that he and several others then went outside and returned after the police car left. According to Terry, however, Green argued with Hunter before leaving the restaurant. Terry further testified that he watched Green while the latter was outside. After the police car left, he saw Green reach inside a late model sports car and withdraw what appeared to be a long stick or rifle. After a brief "tussle," however, another man who had joined Green at the car, succeeded in wresting the object away from him. Green then crossed the street back towards Eddie's and as he reached the middle of the street and stepped into the light, Terry saw him pull a .22 caliber revolver out of his back pocket. Green then entered the restaurant and waived the gun at Eddie's head.

Terry, who had exited the restaurant when Green entered, observed the confrontation from a window. He saw that Eddie,

---

**4.** There is conflicting testimony, from Terry, regarding the knowledge of the District Attorney's Office that he was being placed in protective custody. At trial, Terry testified that he had no conversation with any member of the district attorney's staff prior to being placed in jail on the 19th. At the suppression hearing, however, he testified that prior to entering into protective custody, he called R. C. Hack, an investigator for the District Attorney's Office, who had instructed Terry to call him should any problems arise. He further testified that Hack also talked to the officer who had placed the call for Terry. (Aug. RT 98–99.) If this testimony was correct, then Hack, who was aware of the scheduled lineup, either failed to

tell the jail officers of this or they failed to pass this information on to the desk officers.

In any event, the police were aware that Terry was a state witness. Yet, apparently, they made no effort to determine who he was to testify against and whether that person was present in the jail.

**5.** It's reasonable to assume that after having met with the police, the District Attorney's Office and with defense counsel, Terry was well aware of the name of the case in which he was to testify. This conclusion is further supported by the fact that at the time they discovered Terry, the police were armed with a subpoena requiring Terry to testify in this case. (Aug. RT 39–40.) *See also* RT 298.

who was standing behind the counter, had his right hand on a .357 magnum. Eddie then swung and apparently struck the left side of Green's head with the gun, knocking him down. At this point Terry moved behind the wall. As he did so he heard shots. He then saw Hunter stumble out of the restaurant as did Green shortly thereafter.

### 1. *The opportunity to observe.*

Terry testified that he was near the pool table when the "argument" between Green and Hunter occurred (RT 233), and that he was approximately eight to nine feet from Green at that time. At the suppression hearing, Terry stated that the argument lasted 15 to 20 minutes. (Aug. RT 86.) At trial, however, he agreed with defense counsel that the argument was fairly short (RT 234).[6]

Terry testified that Green stood across the street from the restaurant, approximately 60 feet away (RT 239), from the time the patrol car arrived until it left. He estimated this time period to be about 20 minutes (RT 236), and on cross examination he insisted on its accuracy but admitted that in an interview with defense counsel, he may have given an estimate of one minute.[7] The testimony of Officer Gary Edwards indicates fairly convincingly that the earlier estimate in fact was the most accurate. On direct examination by the prosecution, Officer Edwards, who was the only patrolman assigned to the area, stated that he arrived in the area at about 2:25 a.m. and stayed for approximately two minutes during which time he "checked out a female and another subject standing across the street from Eddie's Place."[8] (RT 393.) With respect to lighting conditions during this time period, Terry testified that there was "enough light out there to see a figure

and see somebody pick something up but you can't tell what it is." (RT 240.)

Terry also testified that a few seconds elapsed from the time Green stepped into the light in the middle of the street until Green entered the restaurant. (RT 241.)

Terry observed the subsequent confrontation between Green and Hunter for approximately two seconds. (RT 250.)

### 2. *The witness' degree of attention.*

Prior to July 13, Terry had never seen Green. While he may have seen Green enter the restaurant that morning, he paid no attention to Green until the argument with Hunter. (Aug. RT 87–88.) Terry testified at the suppression hearing that the argument lasted 15 to 20 minutes and he further stated that it drew everyone's attention and that he saw Green's full face for that period of time. (*Id.*) As noted earlier, Terry's estimate of the length of the argument changed at trial, and so did his testimony about the amount of attention he paid to its participants.

At trial Terry stated that Green came in and the other people already at the pool table "asked how much they were going to shoot for." (RT 191.) Somebody said the police were outside, then Eddie walked up and told everyone to pick up their money. It was then that the argument began. It, however, does not seem to have attracted as much attention as Terry's earlier testimony had indicated:

Q. What happened after Eddie told everybody to take their money up?

A. I guess that is when the argument started, I didn't pay too much attention to it at first.

Q. What brought your attention then to the argument?

---

6. *See* note 8 *infra.*

7. "Might have [said one minute]. Sometimes I say minutes and I mean twenty minutes and it is my figure of speech but it actually were about twenty minutes, I guess." (RT 265.)

8. The patrol car's arrival and departure is the frame of reference for both Terry's and Green's testimony. The argument allegedly was pre-

cipitated by the patrol car's arrival and both Green and Terry agree that Green went outside while the car was there and returned shortly after it left. Therefore, the entire sequence of events from argument to shooting had to have occurred within a period of approximately two minutes, or, at the outside, five minutes, i. e., the time between the patrol car's arrival, 2:25 a. m., and the shooting, 2:30 a. m.

A. I just thought it was a bunch of baloney at first, and I thought he was just kidding around and it led from one subject to another and I didn't pay too much mind to it.

Q. Who is this you are talking about?

A. Green and Eddie.

Q. How loud were Green and Eddie talking?

A. About as loud as we are now.

Q. Could you hear what Green was saying to Eddie?

A. The only thing I really paid some mind to was when he said as soon as Car Three leaves I will be back.

(RT 193.) (Direct examination.)

Terry's testimony regarding the period of time Green spent outside similarly indicates that Green was not the center of Terry's attention, at least not before the struggle over the "long stick or rifle."

Q. Did you look outside?

A. Yes.

Q. Did you see anything unusual take place outside?

A. Nothing but the police car was still out there and Green was standing out in the street dancing and that's all.

Q. He was doing what?

A. The police car was out there and he was just standing out there dancing to himself off the music.

Q. Where was he in relation to the police car when he was doind [sic] his dancing?

A. Right close to it, just dancing close to the car, I guess he were about a couple of steps from the car across the street.

Q. And where was the police car in relation to Eddie?

A. About a car length in front of him.

Q. Was the police car moving or stopped at that time?

A. It was stopped.

Q. Did you see what the policeman was doing?

A. Talking to a girl.

Q. How many girls?

A. I don't know, I didn't pay too much mine [sic].

Q. Did you see—well, did you watch Green for some period of time?

A. No, not really, I just saw him dancing and I turned back around and talked to the man and turned and the police car was still sitting there so I was just watching them really.

(RT 199-200.) (Direct examination.)

Q. And was your attention drawn to anything in particular during the time you were looking out the window?

A. No, not really, but I was just looking is all.

(RT 237.) (Cross examination.)

Q. And how long did you stay in that position [standing at the window] looking north on Soledad Street toward Lord Luther's?

A. A few minutes.

Q. About how long?

A. About a minute.

Q. Huh?

A. About a minute.

Q. Did you see anything unusual during that minute period of time?

A. Nothing but a patrol car was out there and Green was there and two or three other people out there.

Q. Were there a lot of people out in the street?

A. Mostly women.

Q. About how many?

A. I don't know.

Q. Any men out there?

A. A few.

Q. About how many?

A. I don't know.

Q. More than ten?

A. I don't know.

Q. Was your attention—is it correct that your attention during the time you were at the window was attracted primarily to the police car and what was going on with respect to it?

A. Right.

Q. And during that period of time you didn't notice the person that you have identified as Green. Is that correct?

A. I could see him.

Q. Did you see him, was he within your direct scope of vision or was he kind—did you see him out of the corner of your eye or exactly how did you see him?

A. I turned my head slightly to the left and saw him.

MR. REED: I'm sorry, I missed that.

THE WITNESS: I turned my head slightly to the left and I saw him.

BY MR. LAWRENCE: Q. Were you paying any particular attention to him during that period of time?

A. He wasn't doing nothing but dancing in the street.

Q. Did this engage your attention or was your attention focused primarily on what the police was doing?

A. I was just mainly at the window to be looking and that's all.

(RT 238–39.) (Cross examination.)

A fair summary of the preceding and of all of the other relevant testimony given by the state's witnesses demonstrates that Terry's opportunity to observe and his degree of attention were very low: There was a brief argument, to which Terry paid little attention, between Hunter and a man whom Terry had never seen before. After the argument, this person went outside for approximately two minutes. Terry looked out the window at this time, but did not pay any particular attention to this person (at least not until a brief struggle over a long object) who was approximately 60 feet away standing on the dark side of the street, along with several other men.

About in the middle of the street, this person stepped into some light at which point Terry saw him pull out a gun. A few seconds later (RT 241) this person came through the front door and Terry went out. Terry looked back through the window for approximately two seconds, during which time he saw Hunter swing at his assailant. Terry then moved away and subsequently heard shots fired. Thus, assuming that the person who argued with Hunter is the same person who Terry saw waiving a gun in Hunter's face, he was under Terry's observation for a few minutes at the most. More importantly, the amount of time during which Terry paid close attention to Hunter's assailant totalled a matter of seconds.

In contrast to the instant case, the witness in *Biggers, supra,* not only was the victim of the assault, rather than a "casual observer," but her attention was focused upon her assailant for a very substantial period, up to one half hour. 409 U.S. at 200, 93 S.Ct. 375. Nor was Terry a trained observer, as was the undercover officer whose identification the *Manson* court found reliable although he only saw the suspect for two to three minutes.[9] Of course, a finding of reliability is not precluded because the witness is an untrained casual observer; this is more often the rule than the exception. But consideration of the other factors outlined in *Biggers* rules out a finding of reliability in the instant case.

3. *The accuracy of Terry's prior description.*

It is undisputed that a few hours after the shooting Terry identified someone named Hightower as Hunter's murderer.[10]

---

**9.** The *Manson* Court also noted that the officer stood within two feet of the suspect and that "It was near sunset, to be sure, but the sun had not yet set, so it was not dark or even dusk or twilight. Natural light from outside entered the hallway through a window. There was natural light, as well, from inside the apartment." 432 U.S. at 114, 97 S.Ct. at 2253.

**10.** At oral argument before this court the attorney general attempted to minimize the significance of this misidentification by pointing out that Judge Paik examined the photo array and professed an inability to pick out Green. Judge Paik did make such a statement, however, he also stated, "With the exception of 27—next one. With the exception of 27–C, that seems to indicate that an individual is on a bed. Other than that, the court was not able to pick out the photograph of Mr. Green out of these nineteen photographs." (RT 560.) Terry, of

According to the detective who interviewed him, Terry "advised that this picture closely resembled the person he had observed. However, he would have to see the person in person and hear this party talk to be positive." (RT 476.) Terry's testimony at the suppression hearing did not evidence even the slight hesitancy indicated by the detective: he did not just pick out a picture of someone resembling the assailant; he picked out *Green's* picture. (RT 94.) (Direct examination by state.) On cross examination Terry was asked,

Q. And it was during the time that you were at the Salinas Police Department within 4 to 6 hours after the shooting you were shown this group of photos and you picked out Mr. Green's photograph as the person who shot Mr. Hunter. Is that correct?

A. (Witness nodding.)

Q. And you are absolutely sure at that time that the photograph you pointed to was the photograph of the person who had committed the shooting. Is that correct?

A. (Witness nodding.)
MR. REED: Objection.
THE COURT: Your answer?
THE WITNESS: Yes.

(RT 99–100.)

Another fact relevant to the question of prior identifications, is Terry's insistence that on October 17, he saw a color picture of Green lying on a desk in a police station office. Terry said he was alone at the time. (Aug. RT 96, RT 259–60.) Detective Sparks testified that he and his partner never took Terry to the police station, though they did take him to the District Attorney's Office where they spent some time in Investigator Hack's office. Terry, however, was not alone at any time while at the DA's office. (RT 480.) Detective Sparks further testified that he did not see a color photograph of Green and that, to his knowledge, the police department possessed no such photograph. (RT 478–79.) Mr. Hack similarly testified that to his knowledge, the DA's office did not possess a color photograph of Green. (RT 556.) Thus it appears that Terry either lied about seeing a photograph or that the picture he saw was that of someone else. In the latter event, there were two prior misidentifications.

*4. The level of certainty demonstrated at the confrontation.*

Most of the accidental encounter cases have emphasized the witness' spontaneous recognition of the defendant as a factor in their decision that due process was not violated by subsequent in-court identifications or by testimony regarding the out-of-court identifications. *See, e. g., Colclough, supra,* 549 F.2d at 941 ("Nor is there anything in the record to contradict Pyfferoen's testimony that his identification of Sullivan in the hallway was spontaneous and positive."); *Massaro, supra,* 544 F.2d at 550, 551 ("We also note the District Court's finding that Ms. McKanney had 'a spontaneous and genuine reaction when she saw the defendant.' This negates the likelihood of misidentification, particularly as this finding is not attacked here as insupportable in the record."); *Mock v. Rose,* 472 F.2d 619, 621 (6th Cir. 1972), *cert. denied,* 411 U.S. 971, 93 S.Ct. 2165, 36 L.Ed.2d 693 (1973) (upon seeing defendant in hallway, witness began hollering, "that's him, that's him.") In the instant case, the only evidence of spontaneous recognition is Terry's own statement that he recognized Green immediately upon awakening in the cell.[11] Judge Paik, how-

___

course, didn't pick out *either* photograph of Green. Furthermore, the relevance of Judge Paik's observation goes to the fairness of the photographic array, a matter that is not disputed here. The relevant inquiry would have been how much does Hightower resemble Green. All that we know from Judge Paik's comment is that the (one) picture of Green did not resemble Green.

11. As he did on other crucial matters, Terry contradicted himself on this point. On cross examination defense counsel questioned Terry further as to when he recognized Green:

BY MR. LAWRENCE: Q. What did you do when you recognized Mr. Green?
A. I didn't do nothing but I just asked the jailer to let me out.

ever, made no finding that he found this testimony to be credible. And we think any such finding would have been inconsistent with the undisputed fact that Terry remained in the cell with Green for one hour to one hour and a half, and asked to be released only after Green's name was mentioned.

5. *The time between the crime and the confrontation.*

More than three months passed between the July 13 shooting and the October 19 confrontation. *Cf. Manson, supra,* 432 U.S. at 116, 97 S.Ct. at 2253 ("We do not have here the passage of weeks or months between the crime and the viewing of the photograph."). In *Biggers, supra,* the Court acknowledged that such a delay, there seven months, "would be a seriously negative factor in most cases." 409 U.S. at 201, 93 S.Ct. at 383. The Court found, however, that

> the testimony is undisputed that the victim made no previous identification at any of the showups, lineups, or photographic showings. Her record for reliability was thus a good one, as she had previously resisted whatever suggestiveness inheres in a showup.

*Id.* None of the mitigating factors noted by the *Biggers* Court are present in this case to offset the prejudicial effect of the three-month delay.

> Q. In fact you sat there and had lunch with Mr. Green, didn't you?
> A. Uh-huh.
> Q. And it wasn't until later when somebody referred to my client as Mr. Green that you suddenly realized who this person was. Is that correct?
> A. (Nodding.)
> Q. You have to answer audibly.
> A. He knew who I was. He knew who I were.
> Q. I didn't hear.
> A. He knew who I were.

12. It is the defendant's burden to establish that the pretrial confrontation violated due process; then the burden shifts to the state to demonstrate by "clear and convincing evidence" an independent basis for the courtroom identification. *United States v. Wade,* 388 U.S. 218, 240, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Pulaski, Neil v. Biggers : The Supreme Court Disman-*

6. *The corrupting effect of the pretrial confrontation.*

We are instructed by the Supreme Court that "[a]gainst these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson, supra,* 432 U.S. at 114, 97 S.Ct. at 2253. This presupposes that analysis has revealed "indicators of [the witness'] ability to make an accurate identification." *Id.* 432 U.S. at 116, 97 S.Ct. at 2253. In the instant case, there are virtually no indicators of reliability against which to weigh the corrupting influence of the jailhouse confrontation. Thus it is easy to conclude that the balance tips sharply in favor of a finding that Terry's identification of Green possesses insufficient aspects of reliability; hence the admission of Terry's in-court identification violated due process.[12]

### III

"[I]n evaluating the admissibility of particular identification testimony it is sometimes difficult to put other evidence of guilt entirely to one side," *Manson, supra,* 432 U.S. at 118, 97 S.Ct. at 2254 (Stevens, J., concurring), but the concept of fairness that underlies our due process inquiry requires that we do so. Having concluded, however, that due process was denied by the admission of Terry's identification testimony, other evidence of Green's guilt is relevant to the question whether that error

*tles the* Wade *Trilogy's Due Process Protection,* 26 Stan.L.Rev. 1097, 1112 (1974). But since the Court's decision in *Neil,* this distinction has become blurred because the criteria of "reliability" are virtually the same as the criteria of "independent source." Thus a defendant who establishes that the pretrial confrontation violated due process also establishes the lack of an independent source for the in-court identification. *See* N. Sobel, Eye-Witness Identification § 37 at 28, 70 (Supp.1978). *Cf. Thacker v. South Carolina,* 438 F.Supp. 447, 453 (D.S.C. 1977) ("the same factors bearing on the reliability of the witness's initial observation used in the *Manson v. Brathwaite* analysis also figure in the determination of whether the *in-court* identification could be purged of the unconstitutional taint of a defective out-of-court identification.").

was harmless. *Id.* at n; *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Error is harmless only if it can be proven beyond a reasonable doubt that it did not contribute to the verdict obtained. *Chapman, supra* at 24, 87 S.Ct. 824. A finding of harmless error may be made where the tainted evidence is merely cumulative and the untainted evidence of guilt is overwhelming. *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

■ In the instant case, it must be remembered that Terry was the only witness who testified that he saw Green armed with a gun and threatening Hunter with it.[13] Without Terry's testimony, the evidence of guilt is far from overwhelming, as is apparent from the following brief summary of the testimony of the state's other percipient witnesses.

*Stanford Hill.* Hill claims to have seen Green heading back into the restaurant, after struggling with someone over a baseball bat, but he didn't see anything in Green's hands. Hill did pick Green's picture out of the photo array, but his statement at that time was that it was the person who "had been involved with some sort of hassle with a Negro across the street from Eddie's." (RT 282.) (Testimony of Detective Maricle.) On that same day, early on the morning of the 13th, he also told Detective Maricle that he had been outside the restaurant helping someone, whose car had gotten stuck on a concrete abutment, when he first heard the shots. (RT 483.) (At trial he stated that this incident actually had occurred much earlier in the morning. (RT 343.)) On direct examination by defense counsel, Detective Maricle stated that Hill did not say he had witnessed an argument between Green and Hunter. When, on cross examination, the prosecutor inquired further, Detective Maricle stated that Hill was asked if he had seen Green and Hunter together and "[h]is reply was the fact that he was in the kitchen cooking, and that he did not witness any encounters between the two." (RT 484-85.) The prosecutor asked no further questions.

*Michelle Savin.* In his opening statement, the prosecutor indicated that Ms. Savin would be one of his more reliable witnesses, because, as a prostitute, she would be more observant than most people. Ms. Savin was potentially one of the strongest prosecution witnesses. Shortly after the shooting, she gave a description of a man who had pointed a gun at Eddie. The height and weight estimates were off, but her description of the assailant's clothing very closely matched Green's attire that night. Also, later that morning, she picked out Green's photograph from the array as that of the assailant. Unfortunately for the prosecution, at trial Ms. Savin testified that she did not look at the assailant's face; she saw the gun and took off. She thus was unable to make a positive identification of Green as the person who had waived the gun at Hunter.[14]

---

**13.** The importance of Terry's testimony also is evidenced by both counsels' focus upon it in their closing arguments as well as by the revelation in a pretrial conference that the state most likely would have dismissed the charges against Green if Terry had remained missing. In explaining to Judge Paik why a lineup had not been requested earlier, defense counsel noted Terry's disappearance and further stated, without objection from the deputy district attorney, William Reed,

"As I said a discovery order had been signed by Judge Leach on September the 30th requiring the prosecutor to number one, provide me with the names and current addresses of all persons to be called as witnesses by the prosecution at the trial [. B]ecause Mr. Terry was not available. [sic] Mr. Reed was not able to comply with that discovery order and that aspect *and I might also add that the October 14th trial date was not considered likely to go to trial on October 14, rather my information with Mr. Reed was they were probably going to dismiss because of Mr. Terry's absence* and all of these are the reasons why a lineup was not requested. (Aug. RT 34) (emphasis added.) (The trial date actually was October 20. (Aug. RT 63.))

**14.** Although it is inconsistent with her testimony that she did not see the assailant's face, at a lineup arranged just prior to her testimony, Ms. Savin selected Green as a possible suspect. She, however, also selected two other gentlemen out of the seven who were presented to her.

*Manuel Lema.* Mr. Lema was another prosecution witness whose testimony probably came as a surprise to the prosecutor. Initially he stated that there was a shooting and that he ran out of the restaurant and later was asked questions by the police. Beyond that, the essence of his testimony was "I don't remember anything. I was drinking. I don't remember. I don't remember." (RT 175.) Unsatisfied with these responses, the prosecutor pressed Mr. Lema until Lema stated, "I just saw a big, tall, skinny colored guy had a small pistol like that and he went across to the Volkswagen and that was the only thing I know." (RT 176.) Green is 5'7" tall (Lema is 5'5") and testified that on July 13 he weighed approximately 155 pounds. Testimony presented by the state established that Green was driving a 1975 Cougar automobile on July 13.

The error in admitting Terry's testimony was not harmless.

### IV

Mr. Justice Frankfurter once said:

What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure.

The Case of Saco and Vanzetti 30 (1927) (quoted in *Wade, supra,* 388 U.S. at 228, 87 S.Ct. at 1933).[15] Our extensive review of the more than 800 page record that accompanied Green's petition has led us to the conclusion that his conviction is but a further example of the "hazards" of identification testimony.

IT IS THEREFORE ORDERED that the writ of habeas corpus issue and that the petitioner be released from custody unless the State of California begins new criminal proceedings against the petitioner within 60 days.

---

15. Scientific findings made in the years since Justice Frankfurter made this observation consistently have supported its validity.

*Memory decay over time.* Even if someone accurately perceived an event, its representation in the observer's memory would not remain entirely intact for very long. People forget both quickly and easily. The phenomenon of forgetting what once has been perceived and encoded in memory, known as "retroactive inhibition," is one of the earliest and most consistent findings of cognitive psychology. Simply put, the more time that has elapsed since the perception of some event—and, therefore, the more intervening occurrencies that must be stored in memory—the poorer a person's memory is of that event. Particularly with visual images, memory begins to decay within minutes of the event, so that considerable memory loss probably occurs during the many days—and often months—that typically elapse between the offense and an eyewitness identification of the suspect in a criminal case.

*Filling gaps in memory.* Many psychologists once thought that automatic decay of the memory trace caused all distortions of memory. More recently, however, they have discovered that memory, like perception, is an active, constructive process that often introduces inaccuracies by adding details not present in the initial representation or in the event itself. The mind combines all the information acquired about a particular event into a single storage "bin," making it difficult to distinguish what the witness saw originally from what she learned later. Because all of the research on human memory indicates that the actual memorial representation must decay in accuracy over time, any reported increases in the completeness of a description come only at the risk of a reduction in the description's correctness. If a witness' description of a suspect becomes more detailed as the investigation proceeds from the police report through the preliminary hearing to trial, the witness in this situation probably unconsciously has changed the image in memory to include details subsequently acquired from, for example, newspaper reports of the event or a mug shot of the defendant. Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification,* 29 Stan.L.Rev. 969, 982–83 (footnotes omitted).