**Carlos GONZALEZ, Plaintiff,**

v.

**Edward HAMMOCK, Defendant.**

**No. 79 Civ. 1819 (HFW).**

United States District Court,
S. D. New York.

Oct. 12, 1979.

Carlos Gonzalez, pro se.

Robert Abrams, Atty. Gen., New York City by Paul E. Milbauer, Deputy Asst. Atty. Gen., New York City, for Hammock.

## OPINION

WERKER, District Judge.

■ *Pro se* petitioner Carlos Gonzalez, seeking release from the supervision of the Parole Board,[1] commenced this habeas corpus proceeding pursuant to 28 U.S.C. § 2254. He claims that his conviction was obtained in violation of the fourteenth amendment to the Constitution of the United States. The substance of his claims[2] is unnecessarily suggestive and unreliable; 2) that the in-court identification of petitioner by Officer Moroney was unreliable; and 3) that the showup was not accidental and even if accidental was nevertheless unconstitutionally unreliable.

Grounds one and three assert the basic due process argument. Ground two is somewhat ambiguous. If it means the identification by Moroney of petitioner as the one whom Grant

---

1. Despite petitioner's release on parole March 2, 1979, he remains in custody for purposes of the habeas corpus statute. *Jones v. Cunningham,* 371 U.S. 236, 243, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963); *accord, U. S. ex rel. Gray v. N. Y. State Board of Parole,* 416 F.Supp. 823, 824 (S.D.N.Y.1976).

2. Petitioner asserts three related grounds: 1) that the admission at trial of Officer Moroney's testimony about the pre-trial identification violated his right to due process because it was

that the admission at trial of a pretrial eyewitness identification made during a precinct house showup was so impermissibly suggestive and unreliable that it created a "substantial likelihood of irreparable misidentification," *Manson v. Brathwaite*, 432 U.S. 98, 107, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), therefore violating his right to due process of law.

 Petitioner was convicted of two counts of robbery in the first degree, N.Y. Penal Law § 160.15, by a jury in New York Supreme Court, Bronx County on May 27, 1976. He was sentenced to an indeterminate prison term of five to ten years. On direct appeal, he presented his due process arguments to both the Appellate Division, First Department and the New York Court of Appeals. Both courts rejected his arguments. *People v. Gonzalez*, 61 A.D.2d 666, 403 N.Y.S.2d 514 (1st Dep't 1978), *aff'd mem.*, 46 N.Y.2d 1011, 416 N.Y.S.2d 239, 389 N.E.2d 834 (1979). Because the claims raised in this petition have been presented and rejected on direct appeal, the § 2254(b)[3] and (c)[4] exhaustion dictates have been satisfied. *See Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Wilson v. Fogg*, 571 F.2d 91, 92–93 (2d Cir. 1978); *Fielding v. LeFeure*, 548 F.2d 1102, 1106–07 (2d Cir. 1977).

Because petitioner was apprehended in the "getaway car" shortly after the robbery, the issue[5] at trial was whether he was an active participant, the shotgun-toting third man, or merely an uninvolved fourth occupant of the car. The only direct evidence of his active participation is the allegedly suggestive and unreliable identification by one attendant and a sketchy description by the other attendant that could fit another participant as well. For this reason, a careful examination of the facts surrounding the identification and the application of federal constitutional law to such situations is necessary.[6]

I

At approximately 10:20 p. m. on July 18, 1975, three armed men robbed two attendants, Francisco Acevedo and Erald Grant, of a gas station in the Bronx. According to their testimony a tall thin man with glasses (Jesus Velez) forced Acevedo to hand over his money and to walk toward the station office door (W. 22–28).[7] Meanwhile, a short dark-skinned man (James Devia) (W. 157–60) and then Velez (W. 162–65) similarly coerced Grant. As each attendant separately made his way to the office, he passed a third man with a shotgun. Acevedo passed him at a distance of about nine feet

identified, it is specious. If it means that Moroney should not have been allowed to testify to the prior identification because it was unreliable, it addresses the same issue as both one and three.

3. Section 2254(b) provides:

 (b) An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

4. Section 2254(c) provides:

 (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

5. Petitioner was also charged with criminal possession of a weapon, in the second degree, based upon Detective Martone's testimony. This evidence does not establish petitioner's presence in the gas station and was to be considered by the jury only if it first acquitted petitioner on the robbery charges. (Tr. 575–76). It is therefore not being considered by this court.

6. Although "the habeas court must accord such prior state findings great weight . . . it is equally true that the habeas court must itself insure that the relevant facts were found and that the correct legal standard was applied to them." *United States ex rel. Williams v. La-Vallee*, 487 F.2d 1006, 1010 (2d Cir. 1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974); *see Jackson v. Fogg*, 589 F.2d 108, 111 (2d Cir. 1978).

7. Citation to the minutes of the *Wade* hearing will be designated as "W" and to the trial transcript as "Tr.".

(W. 48) and managed a two-second glimpse (W. 29–30). Although the station was reasonably well-lit (W. 53, 55), a dungaree hat pulled low over the third man's face denied Acevedo a good facial view (W. 62, 102). Grant was also afforded a glimpse of the third man for only two seconds (W. 210) from a distance of approximately four feet (W. 180). When Grant met Acevedo at the office door, they turned and saw the three men enter a gold car and speed off (W. 38, 212).

Meanwhile, Officer Moroney saw the gold car pass through a red light and then noticed the attendants yelling (W. 279–80). He chased the car at high speed for some ten blocks until traffic forced it to stop (W. 281).[8] As the gold car stopped, both doors swung open, Devia exited from the passenger side firing a .45 calibre pistol (W. 283) and Oscar Rodriguez exited from the driver's side firing the shotgun allegedly used by the third man (W. 284). Devia was quickly killed (W. 283). Rodriguez was wounded, dropped the shotgun and fled firing a small handgun (W. 284). He was not apprehended until later that evening (W. 345, Tr. 451). Meanwhile, Detective Martone had arrived in another police car. He jumped onto the rear of the gold car and ordered the two remaining occupants to freeze (W. 286, Tr. 230). He testified that petitioner threw a shiny object to the front of the car (Tr. 230). The .22 calibre pistol allegedly used by Devia was later found in the front seat (Tr. 283). Velez and petitioner were arrested and brought to the precinct. The shotgun, the .22 and the .45 were recovered but, regrettably, no attempt was made to check for fingerprints (Tr. 284).[9]

Sometime between 10:30 and 11:00 p. m. two unidentified police officers took Grant to the precinct. Although they did not talk to Grant during the trip (W. 215–16), he was aware that his apprehension concerned the robbery (Tr. 292–93). At the precinct he was left unattended in an upstairs office. Shortly after 11:00 p. m. he was joined by Acevedo. Unlike Grant, Acevedo had been told that the police "got one, one [got] killed, one got shot and two inside." (W. 41, 65). Although he waited awhile with Grant, they testified that they did not discuss the robbery (W. 219) nor were they questioned (W. 65–66, 215–16, 219) by the police present on that floor (W. 270, 274).

Meanwhile, Officer Moroney had brought Velez and petitioner up to the same floor in handcuffs. As he questioned them in an adjoining room, Grant (W. 228) and later, Acevedo (W. 218) watched. Moroney eventually locked Velez in a cell between the two rooms and took petitioner into a third room (W. 290–91), still in view of Grant and Acevedo (W. 229, 333). Both Grant (W. 241, Tr. 397) and Moroney (W. 347) testified that no one in the offices resembled the prisoners. At approximately midnight, Moroney left petitioner in the third room, walked into the middle room and noticed Grant and Acevedo for the first time (W. 292).[10] Upon questioning them, he elicited a description of Devia (W. 335). When asked to describe the other two men, however, Grant instead indicated Velez (W. 294, 335) and then petitioner (W. 294, 336, Tr. 398, 437). Acevedo concurred in Grant's identification of Velez (W. 336) but did not make a positive identification of petitioner (W. 45). Eight months later, at the *Wade* hearing, neither attendant could identify petitioner (W. 48, 196).[11] Acevedo described him as average

**8.** Although Officer Moroney testified that he lost sight of the car for a brief moment, it has not been asserted that he chased the wrong car because of license plate verification.

**9.** Obviously, the presence or absence of petitioner's fingerprints on the shotgun would have been probative. Assistant District Attorney Janiec stated one possible reason for the failure to check prints in his summation, "[fingerprints are] used to detect who had things. We know who had them." (Tr. 532). Unfortunately,

such knowledge was the ultimate issue at petitioner's trial.

**10.** Although Moroney had not met them previously, he assumed they were the attendants because Grant was still in uniform (W. 293).

**11.** The prosecution argued that both Velez and petitioner had altered their appearance to thwart identification (W. 131).

height (W. 40) with an Afro-style haircut and wearing a dungaree hat, a white T-shirt and dungarees (W. 45). Grant could describe him only as light skinned and short (W. 180), about five feet tall (W. 199).

Contrary to the summary conclusion of the Appellate Division, *People v. Gonzalez*, 61 A.D.2d at 670, 403 N.Y.S.2d at 516, confusing petitioner with Rodriguez as the third man is quite possible. Rodriguez was described as a male hispanic, about 5'7", light skinned, short haired and wearing a white dashiki.[12] Petitioner is a male hispanic, 5'7" tall.[13] At the time of arrest he had a short Afro-style haircut and wore a white T-shirt. In light of the possibility of misidentification and the less than detailed state court examination of the constitutional issues, a more thorough examination is in order.

## II

Unlike other constitutional exclusionary rules, the due process test for eyewitness identification is not designed to deter untoward police conduct. Instead, "the central question [is] whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *accord, Manson v. Brathwaite*, 432 U.S. at 106, 97 S.Ct. 2243. Therefore, the Supreme Court has established a two-step test which requires first an investigation to determine whether the identification was impermissibly suggestive and, if so, whether it was thus so unreliable to raise "a substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. at 107, 97 S.Ct. at 2249; *Neil v. Biggers*, 409 U.S. at 198, 93 S.Ct. 375; *Jackson v. Fogg*, 589 F.2d 108, 111 (2d Cir. 1978). The *Biggers* court listed five factors to consider when ascertaining relia-

bility: a) the opportunity of the witness to view the suspect at the time of the crime; b) the witness' degree of attention; c) the accuracy of the witness' prior description; d) his level of certainty at the confrontation; and e) the lapse of time between the crime and the confrontation. 409 U.S. at 199–200, 93 S.Ct. 375. The *Manson* court further weighed these factors against "the corrupting effect of the suggestive identification itself." 432 U.S. at 114, 97 S.Ct. at 2253.

### Suggestiveness

I find the prolonged opportunity of the witness to view petitioner handcuffed and under interrogation in the stationhouse, in the presence of no other possible suspects but Velez, to be impermissibly suggestive.

Although a showup, "without more," does not violate due process, *Neil v. Biggers*, 409 U.S. at 198, 93 S.Ct. 375, its use, especially in a police station when less suggestive methods are available, has generally been condemned as the least reliable form of eyewitness identification. *See e. g., Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *United States v. Wade*, 388 U.S. 218, 234, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Jackson v. Fogg*, 465 F.Supp. 177, 185 (S.D.N.Y.), *aff'd*, 589 F.2d 108 (2d Cir. 1978). Furthermore, this is not a case of a showup "without more." Although Grant was not specifically told: "[H]ere is the perpetrator, identify him," he was the recipient of many elements of suggestion, which "can be created intentionally or unintentionally in many subtle ways." *United States v. Wade*, 388 U.S. 218, 229, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967). He had been told by his manager that he was to go to the precinct to discuss the robbery (Tr. 292–93); he was asked by Officer Moroney (while petitioner was visible in an adjoining room) if he saw anybody who

---

12. As Justice Murphy indicated in his dissent, a dashiki, a loose waist-length garment, could easily be confused as a T-shirt. *People v. Gonzalez*, 61 A.D.2d 666, 673, 403 N.Y.S.2d 514, 519 (1st Dep't 1978), *aff'd*, 46 N.Y.2d 1011, 416 N.Y.S.2d 239, 389 N.E.2d 834 (1979) (mem.) (Murphy, J., dissenting).

13. Although the record does not indicate petitioner's height, his brief submitted to the Court of Appeals cites his arrest record as listing him at 5'7". Appellant's Brief to Court of Appeals at 10.

was involved in the robbery (W. 273); he had a prolonged opportunity to view petitioner handcuffed and in the presence of the easily recognized Velez with no other possible suspects [14] while the robbery weapons were visible. It must have been quite apparent to him that the. police had no doubt they had their man.

■■ The state court held the showup identification not impermissibly suggestive because it was accidental and spontaneous. *People v. Gonzalez*, 61 A.D.2d 666 at 671, 403 N.Y.S.2d at 517. These grounds are somewhat superficial. A showup is not automatically deemed constitutionally permissible merely because it is accidental, and furthermore, the identification in the instant case was hardly spontaneous. In *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the Court emphasized that "it is always necessary to 'scrutinize *any* pretrial confrontation . . . .' " *Id.* at 690–91, 92 S.Ct. at 1883 (quoting *Wade*, 388 U.S. at 227, 87 S.Ct. 1926). Moreover, this circuit has recently held that an unarranged showup can still be impermissibly suggestive. *Jackson v. Fogg*, 589 F.2d at 111.

■ Accidental showups are generally deemed permissible because they "usually give no indication to the witness that 'this is the man.' " *Green v. Loggins*, 461 F.Supp. 24, 28 (N.D.Cal.1978). Furthermore, while an arranged showup might connote intent to suggest, which implies that the witness was influenced, a truly accidental showup creates no such inference. However, even unintentional showups can induce witnesses to believe that the police have no doubt as to the suspect's guilt. It is obvious that Grant could have been so influenced. The likelihood is increased because Grant had no way of knowing that there could have been a fourth suspect not involved in the robbery; he could only assume that Velez's co-prisoner was the third robber with the shotgun.[15]

■ Another justification proffered for the permissible use of accidental showups is that they are unavoidable.[16] *E. g. Allen v. Moore*, 453 F.2d 970, 974 (1st Cir.), *cert. denied*, 406 U.S. 969, 92 S.Ct. 2422, 32 L.Ed.2d 668 (1972). This showup, however, was certainly avoidable. Both the witnesses and the suspects were in the control of the police and, whether intentionally or accidentally, were put within sight of each other.[17] *See Green v. Loggins*, 461 F.Supp. at 28–29. An action as simple as closing a door might have averted the whole confrontation.

■ Furthermore, the identification was not spontaneous. Grant and later Acevedo sat alone for nearly one hour watching Moroney interrogate petitioner and Velez while handcuffed and in the presence of the robbery weapons. A declaration of recognition made after one hour of observation is hardly spontaneous.[18] The prolonged op-

---

**14.** *See United States ex rel. Phipps v. Follette*, 428 F.2d 912, 913–14 (2d Cir.) *cert. denied*, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970).

**15.** Grant would not have mistaken petitioner for Devia because Devia's much darker face had been clearly visible during the robbery.

**16.** Other rationales that have made suggestive showups permissible include: the impending death of the witness, *Stovel v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); the need to recommence investigation if the suspect is incorrect, *United States ex rel. Cummings v. Zelker*, 455 F.2d 714, 716 (2d Cir.), *cert. denied*, 406 U.S. 927, 92 S.Ct. 1800, 32 L.Ed.2d 128 (1972); and the sparing of innocent people needless incarceration, *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). None of these rationales are compelling here. The witnesses were

not in danger of death, the search for the sole suspect not in custody continued despite the identification and there is no indication that the police expedited the identification process to exonerate petitioner.

**17.** Perhaps Officer Moroney can be exonerated for his part in the showup because it was not his precinct (*see* W. 278) and he may not have been aware that the witnesses were in the adjoining room. The unidentified officers who brought the witnesses to the precinct, however, should have been aware of the possibility of an accidental confrontation.

**18.** *Webster's Third International Dictionary* (unabridged 1971) defines spontaneous as "arising from immediate natural impulse; unpremeditated, impulsive . . . ."

portunity to view the suspect destroys the inference of reliability inherent in spontaneity.

■ Finding the identification procedure to be impermissibly suggestive, I turn to an investigation of its reliability, for though suggestive, it would be constitutionally permissible if it meets the standards of reliability set forth in *Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. 375, because "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253.

*Reliability*

a) *Opportunity to view the suspect.* The witness had only a two-second glimpse of the third man as he walked past about four feet away. Whether the hat still covered the robber's face is not clear from the record of the trial on the *Wade* hearing. Although, at trial, Grant stated he managed a short look at the third man's face (Tr. 352), he did not get a "good look," (Tr. 380) nor could he recall the dungaree hat or anything else about the robber's dress. A two-second glimpse when the witness does not get a good look must be deemed fleeting at best. *Cf. United States ex rel. Phipps v. Follette*, 428 F.2d 912, 916 (2d Cir.), *cert. denied*, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970) (twenty to thirty second observation not fleeting). Two seconds is less of an opportunity to view than afforded the witnesses in *Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. 2243 and *Neil v. Biggers*, 409 U.S. at 200, 93 S.Ct. 375.

b) *Degree of attention.* Grant was not a trained observer like the undercover policeman in *Manson v. Brathwaite*, 432 U.S. at 115, 97 S.Ct. 2243 or the bank teller in *United States v. Watson*, 587 F.2d 365 (7th Cir. 1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979). More than once he admitted to "notic[ing] nothing greatly" about the third man. (W. 211; *see* Tr. 381, W. 180). He had just been robbed by two other men. His attention seems to have been focused more on those two who had directly confronted him than on the third man he glimpsed as the robbery was coming to a close. His own testimony sheds little light on his state of mind. *See e. g.*, W. 201–03.

c) *Certainty.* The witness claimed to be very certain with respect to the station-house identification but was unable to identify petitioner at the *Wade* hearing eight months later or at the trial twenty-two months later. The certainty of the first identification is as strong as in *Manson v. Brathwaite*, 432 U.S. at 115, 97 S.Ct. 2243, though the subsequent inability to identify lessens its weight.

d) *Accuracy of the prior description.* No prior description was given, and the description given after the identification is very sketchy and partially inaccurate. Grant described the third man as shorter than he, about five feet tall, and light skinned. Petitioner's arrest record listed him at 5'7". This sketchy postidentification description does nothing to ensure that the identification was the result of recognition and not the showup; moreover, it fits Rodriguez as well as it does defendant. The standard for reliability is clearly not met.

e) *Lapse of time between crime and identification.* The value of a prompt identification is manifested by the witness' inability to identify petitioner at a later date. Although the Appellate Division was incorrect in stating that the identification occurred less than an hour after the robbery, *People v. Gonzalez*, 61 A.D.2d at 671, 403 N.Y.S.2d at 515, it did occur within two hours. Although this time lapse exceeds the lapse between occurrence and description in *Manson*, 432 U.S. at 115–16, 97 S.Ct. 2243, it is less than the lapse until identification. *Id.* Identification within two hours has generally been considered favoring reliability. *See, United States ex rel. Phipps v. Follette*, 428 F.2d 912, 916 (2d Cir.), *cert. denied*, 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970).

■ Merely finding one or two indices of unreliability is not sufficient to require suppression. *See Neil v. Biggers*, 409 U.S. at 201, 93 S.Ct. 375. Instead of a quantita-

tive balancing test, the *Manson* Court held that the tendency of the suggestive identification must be qualitatively balanced with the indicia of reliability to determine if under the totality of the circumstances there is a "substantial likelihood of irreparable misidentification." 432 U.S. at 107, 97 S.Ct. 2243.

I find that the lack of a verifying prior description, the fleeting glimpse and the possible transferral effect of petitioner's connection with the easily recognizable Velez outweigh the inference of reliability drawn from the witness' certainty and the short lapse of time.

The writ is therefore granted and petitioner is ordered discharged from further custody unless he is retried within 90 days from this date without the use of the tainted identification evidence.

SO ORDERED.