Kenneth SOLOMON, Petitioner-Appellee,

v.

Harold J. SMITH, Superintendent, Attica Correctional Facility, Respondent-Appellant.

No. 1445, Docket 80–2119.

United States Court of Appeals, Second Circuit.

Argued Aug. 20, 1980.

Decided Feb. 26, 1981.

Andrea G. Iason, Deputy Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen., Gerald J. Ryan, Asst. Atty. Gen., New York City, of counsel), for respondent-appellant.

Todd D. Stern, New York City (William E. Hellerstein, New York City, of counsel), for petitioner-appellee.

Before NEWMAN and KEARSE, Circuit Judges, and DUMBAULD, District Judge.[*]

KEARSE, Circuit Judge:

The State appeals from a judgment of the United States District Court for the Southern District of New York, Vincent L. Broderick, *Judge*, granting the petition of appellee Kenneth Solomon for a writ of habeas corpus on the ground that the identifications of Solomon at his state trial were unreliable and resulted from impermissible police procedures, in violation of Solomon's rights under the Fifth, Sixth and Fourteenth Amendments to the Constitution. This case, which arises from Solomon's conviction of robbery, rape, and sodomy, solely on the basis of eyewitness testimony, presents an unusual confluence of circumstances. The events commenced as a robbery of a doctor's office and ended with the three robbers, one of whom wore a hood and was addressed by his companions as "Kenny," raping and sodomizing the receptionist, Nancy Padovani. Padovani, the principal eyewitness, identified Solomon at trial with positive certainty. Her initial selection of a picture of Solomon, however, had been contemporaneously characterized by the police as a "negative" but "possible" identification. Between that initial selection of the Solomon picture and her positive identification at a *Wade* hearing [1] a week before trial, Padovani was shown the Solomon picture several times; she viewed Solo-

---

[*] The Hon. Edward Dumbauld, Senior Judge of the United States District Court for the Western District of Pennsylvania, sitting by designation.

1. A *Wade* hearing is held to determine whether an in-court identification has an independent basis and is therefore admissible. *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

mon at an extended, uncounseled show-up during his arraignment, and she viewed him in a lineup in which the only person even close to his height was 65 pounds heavier than he. The most striking feature of this case, however, was Padovani's selection from an unsuggestive lineup that did not include Solomon, of *another* man as her hooded assailant. It transpired that this man's name too was Kenny, Kenneth Anscombe, that Kenneth Anscombe fit Padovani's initial description of the hooded assailant better than did Solomon, and that Kenneth Anscombe has been convicted of participating in other armed robberies nearby, with one of the non-hooded assailants identified by Padovani.

The combination of circumstances persuaded the district court that the identification of Solomon at trial was impermissible under prevailing constitutional standards, and it ordered the State either to release Solomon or to retry him within 60 days. We affirm.

## A.  *The Crimes*

On October 7, 1974, three black males, one wearing a hood and carrying a gun, entered the office of Dr. Jean-Louis Casseus and announced a "stick-up." The receptionist, Nancy Padovani, led them to Dr. Casseus's office where they robbed the doctor at gunpoint of $50 and his watch. The three then returned to the reception area, took Padovani's watch and some cash from her pocketbook and ordered her to lock the doctor and a patient in a closet. The intruders then raped and sodomized Padovani. The hooded individual stood behind Padovani during some of this time and was the last to assault her. As he did, the other two assailants sought to leave and, apparently becoming nervous, shouted, "Come on Kenny, quick. Let's go." After leaving the doctor's office, the three fled in a taxi. The incident lasted approximately ten to fifteen minutes. Afterwards, Padovani released the doctor and patient from the closet and called the police. She was taken to a hospital for treatment and tests and it was there that she first spoke with Detective

Lawrence Doherty. Padovani described the gunman to Detective Doherty as male, black, age 21, 5'7" tall, weighing 145 pounds, and wearing a blue parka with a hood. Although Padovani was later to testify at the *Wade* hearing that she thought this initial description included a prominent facial scar, there is no mention of a scar in the contemporaneous report of Detective Doherty, whose practice was to ask about and make note of any uncommon identifying marks. Doherty did not recall mention of a scar.

## B.  *Identification by Padovani*

On October 8, the day after the incident, Padovani went to the police station where she was shown two trays of photographs. One tray was labeled "Negro, Male, Sex" and the other "Negro, Male, Robbery under 5'8"." Each tray contained approximately 100 pictures. She selected five or six pictures from these photos and then from that smaller set selected that of petitioner Kenneth Solomon. Doherty made a copy of the picture of Solomon, on which Padovani drew a hood around the face with a blue marker. Although Padovani testified at the *Wade* hearing nine months later that as soon as she drew the hood she was "positively sure" that Solomon was the hooded man who had raped her, on October 8 Detective Doherty recorded Padovani's identification in his photo log book by placing a check mark in the column headed "Negative," rather than in that headed "Positive," and merely wrote "possible" next to his entry in the Negative column. This negative/possible entry in the police log book is the only contemporaneous evidence as to the initial level of Padovani's certainty that Solomon was her hooded assailant.

By the time Solomon was to be tried in the summer of 1975, however, Padovani was quite certain that Solomon was the hooded assailant. In the interim, several events occurred that seem likely to have contributed to her objectively perceptible increase in certainty. First, near midnight on October 17 she was summoned to the precinct house for a lineup by Doherty, who told her Solo-

mon had been arrested. She did not actually see Solomon that night, since by the time she arrived it had been decided not to have a lineup after all; she did, however, see Solomon's picture tacked to a bulletin board in the police station.

On the following day, October 18, Solomon was arraigned. Padovani testified that Doherty had in his hand the same picture of Solomon that she had seen on the police bulletin board the night before. It is unclear how long Padovani and Solomon were in the courtroom together on the occasion of the arraignment, but Padovani met Doherty in court on the morning of October 18, and Solomon was not actually arraigned until nearly 5 p. m. During at least part of the afternoon Solomon was in a detention area of the courtroom with several other persons. Doherty made no effort to ask Padovani at that time if she could pick out Solomon. He waited until after the arraignment had actually taken place—a proceeding that lasted some 20–30 minutes, with only the prosecutor, Solomon, Doherty and Padovani standing before the judge—and then asked, "Did you get a good look at him?" Padovani said she had. Doherty asked, "Is that him?" She said it was. At no time during the arraignment proceeding was Solomon represented by counsel.

After the arraignment there was a grand jury proceeding at which Padovani testified. Before she testified Doherty showed her Solomon's picture again. After Padovani testified before the grand jury, Doherty at least once showed her and other witnesses pictures of persons who might have been the nonhooded assailants. (One such person, Clayton Smalls, was identified by Padovani at a lineup in November.) On each occasion Doherty also showed Padovani the picture of Solomon again.

Finally, on January 16, 1975, Padovani was shown a lineup of five men that included Solomon, whom she identified. Having initially described the hooded assailant as 5′7″ tall and weighing 145 pounds, her selection of Solomon from this particular array was perhaps not difficult. Solomon stands 5′6″ tall and weighs 130 pounds; the only other person in the lineup who was within two inches of this height weighed in at 195 pounds:

|  | Height | Weight |
| --- | --- | --- |
| Suspect # 1 | 5′8″ | 195 lbs |
| Suspect # 2 | 6′ | 170 lbs |
| Suspect # 3 | 6′ | 165 lbs |
| Kenneth Solomon | 5′6″ | 130 lbs |
| Suspect # 5 | 5′10″ | 146 lbs |

In addition, although none of the intruders had been described as having beards or mustaches, and Solomon had no such facial hair, some of the other participants in Solomon's lineup had beards or mustaches.

Before picking Solomon out of this suggestive lineup, Padovani had attended two other lineups on that day, neither of which included Solomon. At the second of these lineups there was an array that was composed entirely of persons close in height and weight to the description initially given by Padovani:

|  |  | Height | Weight |
| --- | --- | --- | --- |
| 1. | Larry Sutton | 5′8½″ | 135 lbs |
| 2. | James Alford | 5′7″ | 169 lbs |
| 3. | Thomas White | 5′7″ | 150 lbs |
| 4. | Kenneth Anscombe | 5′6″ | 147 lbs |
| 5. | Vernon Tull | 5′7″ | 150 lbs |

As soon as the shade went up on this lineup, Padovani instantly picked out *Anscombe* as her hooded assailant: "I see him already, four. That's the one I said."

After Padovani left the viewing room, she retracted her identification of Anscombe. Her testimony at the *Wade* hearing on this identification was as follows:

Q. But in the second line-up, what you are saying, when you picked out that man, was that this was the number one man in the office [i. e., the gunman], right?

\*　　\*　　\*　　\*　　\*　　\*

A. Yes, but I only seen him for one second, not even—I just got scared because I seen the facial features and I, you know, didn't really look. All I saw was the face and I walked away, run out of there because I got scared and I told them outside, "I

made a big mistake because he was much too heavy, you know, Solomon was a little skinnier."

Kenneth Anscombe was indeed fifteen pounds heavier than Solomon; but he weighed just two pounds more than the hooded assailant originally described by Padovani, and he lacked the facial scar that was omitted from Padovani's first description. And Kenneth Anscombe was later convicted of participating in other robberies, in the vicinity of Dr. Casseus's office, with Clayton Smalls, whom Padovani had already identified as one of her nonhooded assailants.

## II

■■■ As the Supreme Court has stated, [t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.... A commentator has observed that "[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—

perhaps it is responsible for more such errors than all other factors combined." Wall, Eye-Witness Identification in Criminal Cases 26.

*United States v. Wade*, 388 U.S. 218, 228–29, 87 S.Ct. 1926, 1932–1933, 18 L.Ed.2d 1149 (1967). In recognition of these realities, we have always given close scrutiny to the possibility of constitutional violations in criminal cases resting largely or solely on eye-witness testimony:

Centuries of experience in the administration of criminal justice have shown that convictions based solely on testimony that identifies a defendant previously unknown to the witness is highly suspect. Of all the various kinds of evidence it is the least reliable, especially where unsupported by corroborating evidence.

*Jackson v. Fogg*, 589 F.2d 108, 112 (2d Cir. 1978). On the basis of the facts detailed above, we agree with Judge Broderick's conclusion [2] that the admission of Padovani's identification testimony at trial violated Solomon's rights under the Due Process Clause of the Fourteenth Amendment [3] and

2. The state court judge at the *Wade* hearing refused to suppress the identifications by Padovani and Dr. Casseus, concluding that each was based on observations made during the crime on October 7, rather than on subsequent events or procedures. He did not, however, either use the analytical framework of *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), *see infra*, or make detailed factual findings with respect to suggestiveness or reliability; he merely concluded that the police procedures were not unfair or unconstitutional. In these circumstances, the district court "quite properly made its own assessment of the undisputed facts" in order to apply the appropriate governing principles. *Jackson v. Fogg*, 589 F.2d 108, 111 (2d Cir. 1978); *United States ex rel. Williams v. La Vallee*, 487 F.2d 1006 (2d Cir. 1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974); *Gonzalez v. Hammock*, 477 F.Supp. 730, 732 n.6 (S.D.N.Y.1979). We agree with Judge Broderick's assessment that the state court's determination is not fairly supported by the record as a whole, and thus is not entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Taylor v. Lombard*, 606 F.2d 371 (2d Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1346, 63 L.Ed.2d 781 (1980). *See Sumner v. Mata*, —— U.S. ——, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

3. Judge Broderick also properly found that the identification by Dr. Casseus violated due process. Dr. Casseus twice viewed a group of ten mug shots in his attempt to identify the intruders. At least one and possibly both of the arrays shown Dr. Casseus included the picture of Solomon on which Padovani had drawn the hood. This emphasized Solomon and was impermissibly suggestive. *See Simmons v. United States*, 390 U.S. 377, 383, 88 S.Ct. 967, 970, 19 L.Ed.2d 1247 (1968). Further, at the *Wade* hearing, Dr. Casseus's recollection and identification of Solomon were anything but impressive. He could give only the most general of descriptions of the intruders: they were black; they were young. He did not remember what descriptions he had given the police. He did not recall noticing any scars. His best effort at identifying Solomon was to testify that Solomon "reminds me of the fellow," and that "[i]t looks like him." He attributed his lack of certainty to the fact that the assailant had been wearing a hood (*see* note 5 *infra*). Unaccountably, at the trial one week later, Dr. Casseus was positive Solomon had been the hooded intruder, and Dr. Casseus now remembered that the hooded assailant had had a scar. Analysis of the facts in accordance with *Neil v. Biggers, supra, see* text *infra*, suggests that Dr. Casseus's identification of Solomon at trial was not reliable.

his right to counsel under the Sixth and Fourteenth Amendments.

A. *Due Process*

■ A defendant's right to due process of law includes the right not to be the object of suggestive police identification procedures that create a "substantial likelihood of irreparable misidentification." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972); *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *Jackson v. Fogg, supra,* 589 F.2d at 111; *see Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). This protection must encompass not only the right to avoid improper police methods that suggest the initial identification, but as well the right to avoid having suggestive methods transform a selection that was only tentative into one that is positively certain. The jury, in order to convict, must find the evidence probative of guilt beyond a reasonable doubt. It will surely be more likely to convict on the basis of testimony that is certain rather · than tentative. Thus, while a witness is always entitled to become surer of an identification, due process precludes the generation of that increased certainty through a suggestive lineup or a prolonged one-on-one viewing not preceded by a proper lineup. *See Simmons v. United States, supra,* 390 U.S. at 383, 88 S.Ct. at 970. *Cf. United States v. Wade, supra,* 388 U.S. at 240–41, 87 S.Ct. at 1939.

■ In the present case, the start of the procedures was apparently irreproachable; Padovani was shown a large array of pictures, from which she selected one. But how certain was she of her selection? The only contemporaneous evidence of her level of certainty was Detective Doherty's recording in his log book. There was a column headed "Positive" and one headed "Negative." He checked "Negative" and wrote "possible" in that column. Hence, we should start with the premise that Padova-

ni's initial identification was not certain. What occurred between this initial uncertainty and the eventual certitude that was conveyed to the jury was a stream of displays of Solomon in contexts that could only fix his image in Padovani's mind. She saw his picture—uncomplicated by any accompanying array—at least four times. *Cf. Simmons v. United States, supra* (the danger of an incorrect identification is "increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw"). Her first opportunity for a post-arrest viewing was a one-person "showup" at his arraignment, when she was in his presence for 20–30 minutes.[4] *Cf. Moore v. Illinois,* 434 U.S. 220, 229, 98 S.Ct. 458, 465, 54 L.Ed.2d 424 (1977) ("It is difficult to imagine a more suggestive manner in which to present a suspect to a witness for their critical first confrontation" than at a preliminary hearing to determine whether to bind the accused over to the grand jury.). She was allowed to see him in a lineup only after she had seen his isolated picture many times and had been standing one person away from him for 20–30 minutes at arraignment; and in the only lineup in which he appeared, all of the other lineup participants were significantly larger than he. The combination of these repeated showings of Solomon was impermissibly suggestive. *Cf. Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

■ Given these impermissible procedures, the teaching of *Neil v. Biggers, supra,* and *Manson v. Brathwaite, supra,* is that the admissibility of Padovani's identification of Solomon at trial depends on its reliability, and as *Brathwaite* makes clear, 432 U.S. at 114, 97 S.Ct. at 2253, the constitutional assessment of reliability requires a balancing of the factors outlined in *Biggers,* against the degree of suggestiveness in the impermissible procedures. *Biggers* and *Brathwaite* refer to five factors to be in-

---

4. A one-person showup does not inevitably taint a subsequent courtroom identification, *Neil v. Biggers, supra,* 409 U.S. at 198, 93 S.Ct. at 381, but the procedure here is cause for concern because the initial photographic identification was not positive, no lineup preceded the arraignment, and the subsequent lineup was flawed.

cluded in an evaluation of the likelihood of mistaken identification. These factors are (1) the witness's opportunity to observe the criminal at the time of the crime, (2) the degree of the witness's attention at that time, (3) the accuracy of the witness's initial description of the criminal, (4) the certainty with which the witness first identified the suspect, and (5) the time lapse between the crime and the identification. Normally, if the first four of these are rated good, especially if the time interval is short, the identification of the suspect will be considered reliable and the likelihood of misidentification insubstantial. Normally, however, the analysis is concerned with only one suspect and there are no serious alternate candidates in the picture. This case presents the unusual situation in which the witness not only identified the defendant, she also selected a highly plausible alternate candidate from a lineup. In these circumstances, the third and fourth factors of the *Biggers-Brathwaite* analysis—initial description and certainty—take on a heightened importance that alters the significance of the first two factors. If the witness's initial description more accurately describes the alternate candidate than the defendant and the selection of the defendant was not positive, thus pointing toward a misidentification rather than toward reliability, then a finding that the witness had a good opportunity to observe and a high degree of attentiveness will further support a conclusion of misidentification rather than suggesting reliability. In the present case the first four *Biggers-Brathwaite* factors point toward a mistaken identification, and the fifth factor is wholly inconclusive.

*First*, Padovani's opportunity to view the criminal at the time of the crime: hers was not a fleeting glimpse; the event lasted 10–15 minutes, and while the hooded assailant was not in her line of vision the entire time, there was more than enough time to see his size and shape and so much of his face as was visible. The hood prevented a comprehensive viewing of the face; it obscured his ears, his hairline, and the shape of his head. Indeed Padovani was forced to draw a hood on Solomon's picture to increase her certainty that this was the right face; and Dr. Casseus remained uncertain through the *Wade* hearing that the unhooded Solomon he could see was the hooded assailant he had seen.[5] *Second*, the degree of Padovani's attention: attention to the event frequently must be distinguished from attention to the assailant. The event was chaotic, harassing, and frightening; Dr. Casseus, for example, said at the *Wade* hearing that he was "watching the gun most of the time." Given the nature of the assault on Padovani, there can be little doubt that she was sufficiently attentive to the assailants to form a strong mental image of their sizes and shapes and so much of their faces as she saw. *Third*, the accuracy of Padovani's initial description of the assailant: her description was only fractionally accurate as to Solomon; it was a remarkably accurate description of Anscombe. Padovani said the hooded assailant was 5'7" tall and weighed 145 pounds. Anscombe is 5'6" tall and weighs 147 pounds. Solomon too is 5'6" tall, but he is 15 pounds lighter. Padovani described the hooded assailant as 21 years old. Anscombe was 18; Solomon was 16. Solomon also has just above his left eye a prominent scar that would not

---

5. At the hearing, Dr. Casseus testified in part as follows:

> Q Now Doctor, as you testified, you indicated that you looked at Mr. Solomon, and you said he looked something like the person?
> A Yes.
> Q And in effect, are you telling us that after the passage of eight months, you are unable to say with certainty that this is the person?
> A If I'm able to—
> Q I'm sorry.

> A I didn't hear you. I don't understand.
> Q Is what you are saying, when you say he looks like the person—
> A Yes?
> Q —an indication that—
> A Well, he doesn't have a hood now. I mean I cannot be exactly the way I saw him.
> Q So you can't be sure that this is the person?
> A It looks like.
> Q And that's the best you could say?
> A Yes, because he had a hood at that time. He's not exactly the same I saw him.

have been concealed by a hood. Padovani did not, according to Doherty's recollection and his notes, mention a scar. Anscombe had no scar. *Fourth*, the level of certainty demonstrated by Padovani in selecting Solomon's picture: the level of certainty must be considered low. Without in any way impugning Padovani's veracity, we discount her recollection nine months later of this initial identification as "positively sure," since it had been contemporaneously recorded by the police as negative/possible, and in the interim she had been subjected to at least six suggestive police procedures, some of which she did not even recall.[6] In addition, one's faith in Padovani's certainty must be shaken by her sudden identification of Anscombe in a nonsuggestive lineup. *Fifth*, the length of time between the crime and the initial identification: this factor viewed in isolation would not point toward a misidentification since the selection of Solomon's picture was made the day after the event. But the immediacy of the selection cannot be evaluated independently of several material considerations, including the facts that (a) the record does not reveal whether Anscombe's picture was in the arrays originally shown to Padovani, (b) the person whose face was selected did not, in two significant respects (weight and scar), match the description Padovani had given, compare *Chavis v. Henderson*, 638 F.2d 534 (2d Cir. 1980), and (c) the identification was not positive.

Thus there is little in the event or in the initial phases of the investigation to suggest that Padovani's certainty was reliable. And during the period between the initial tentative identification and the ultimate certainty there were no fair procedures (such as unsuggestive lineup) that could provide any indicia of reliability.

6. Padovani did not recall being shown Solomon's picture on any occasion after the arraignment. Doherty, however, testified that showed her the picture on at least two occasions thereafter.

7. We do not know whether the benefit of having counsel at the arraignment in this case would have been more than theoretical.

Finally, Padovani's identification of Anscombe strongly suggests that her initial selection of Solomon's picture was a misidentification. Her description of her instant selection of Anscombe from a lineup of five men of nearly the same heights and weights ("I just got scared .... All I saw was the face and I walked away, run out of there because I got scared ....") gives every evidence of genuine recognition. When to this is added the fact that Anscombe's name is Kenneth, that he matches Padovani's initial description nearly exactly, and that he had been associated in other robberies in the same neighborhood with one of the non-hooded assailants already identified by Padovani, we are compelled to agree with the district court that there was "a very substantial likelihood of irreparable misidentification," and that due process compelled the granting of the writ.

## B.  *Right to Counsel*

It is undisputed that Solomon was not represented by counsel at his arraignment. Under New York law arraignment marked the commencement of the criminal action against Solomon. N.Y. Crim.Proc.Law §§ 1.20(1), (8), (17); 100.05; 170.10(1); 180.10(1) (McKinney 1971, 1980 Supp.); *People v. Blake*, 35 N.Y.2d 331, 339–40, 361 N.Y.S.2d 881, 320 N.E.2d 625 (1974). Thus, it was a crucial stage of the proceedings, and Solomon was entitled to have counsel to aid him. *Moore v. Illinois, supra; Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *Hamilton v. Alabama*, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961). In theory, at least, counsel might have been able either to forestall the prejudicial showup of Solomon at arraignment, or to limit the duration of the witness's observation, or, preferably, to precipitate a proper lineup prior to the arraignment.[7]

If an accused's counsel is present at the pretrial identification, he can serve both his client's and the prosecution's interests by objecting to suggestive features of a procedure before they influence a witness' identification.

When the accused has been subjected to a lineup or showup in the absence of counsel at a crucial stage of the proceedings, an identification at trial will not be permitted unless the witness's ability to identify the defendant has an origin "independent" of the uncounseled identification proceeding.[8] *Kirby v. Illinois, supra; United States v. Wade, supra,* 388 U.S. at 239–41, 87 S.Ct. 1926, 1938, 18 L.Ed.2d 1149. The tests of "independent origin" set forth in *Wade* appear to be functionally identical to the reliability tests articulated in *Neil v. Biggers, supra.*[9] For the reasons detailed above in the discussion of the due process issue, we find in the record no independent source of Padovani's certainty that was not itself the product of suggestive police procedures.

The judgment of the district court is affirmed.

DUMBAULD, Senior District Judge (dissenting):

I would reverse. The District Court granted habeas corpus upon the ground that the identification procedures leading to appellant's conviction in state court were impermissibly suggestive. No fresh testimony was taken before the District Court, and its conclusions were not based upon

personal evaluation of the demeanor or credibility of witnesses, but merely upon the same record from the state court which is before us for review.

I am convinced by scrutiny of the record that it was the victim of the crime herself who singled out the appellant as a suspect, as the result of her examination of some 200 photographs, without any influence or persuasion by police officers. The police, indeed, had no specific suspect in mind, and they merely located, apprehended, and brought in for trial the individual identified by the victim as the perpetrator of the offense. While the police work in the case might perhaps be criticized as lackadaisical and unimaginative, it was certainly not impermissibly suggestive; and its shortcomings are not of constitutional magnitude, and cannot be characterized as amounting to denial of due process of law. In fact the victim's identification testimony measures up favorably when appraised in accordance with the standards set forth in the leading Supreme Court decisions on the subject.

## I. THE CRIME

On October 7, 1974, at the office of Dr. Jean-Louis Casseus, 1895 Grand Concourse at Tremone Avenue in the Bronx, Mrs.

---

*Moore v. Illinois, supra,* 434 U.S. at 225, 98 S.Ct. at 463. Ordinarily we would not assume that such requests would be vain. Here, however, the extremely suggestive lineup in which Solomon was placed was held despite his counsel's objection and despite the indisputable availability of five other men each of whom was far closer to Solomon's description than any of the men placed in Solomon's lineup. The practical helplessness of counsel to forestall unfair identification procedures, however, does not diminish the accused's right to counsel nor minimize the breach of that right.

**8.** There was no trial testimony as to Padovani's identification of Solomon at the uncounseled arraignment showup. Evidence of such an identification is per se inadmissible. *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *see United States v. Wade, supra.*

**9.** *Compare Wade,* in which the Court listed factors to be considered as follows:

the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the

defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup.

388 U.S. at 241, 87 S.Ct. at 1939 (footnote omitted), with *Biggers:*

[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

409 U.S. at 199–200, 93 S.Ct. at 382.

Nancy Padovani, the doctor's secretary, at 4:15 p. m. answered the intercom and signaled to release the latch on the locked door when a voice asked to see a person, supposedly a patient, though the name was not recognized by Mrs. Padovani as that of any of the doctor's patients. Three black youths entered the office, one wearing a hood. He took a gun out and said: "This is a stick-up. Give me your money. Where is the doctor?" Thereupon he accompanied her into the doctor's office, and at gunpoint robbed the doctor of $50 and his watch (permitting him to keep a ring). He likewise took Mrs. Padovani's watch and money. Then he had her open a closet, in which he locked the doctor and a patient sitting in the waiting room. Before Mrs. Padovani was inside the closet, he said "No, you come back." She was forced down to her knees, and was raped by all three men. In addition, one of them subjected her to anal sodomy, and one of them holding her by the ear (injuries to which resulted in infection) pulled up her head and put his penis in her mouth. While the hooded assailant was having sexual intercourse with her, one of his two accomplices ran outside to get a cab, and the other held the office door open (because if it closed it would lock). They called to the third rapist to "Hurry up, Kenny, hurry up." When he had concluded, the three fled in a cab. (The license number was observed by the patient's sister, Mrs. Marie Glass, parked outside the building, but neither she nor the taxi driver nor the patient identified the defendant at trial.[1]) Mrs. Padovani had been in close proximity to the hooded intruder during the whole time he was in the office, approximately fifteen minutes. The office was well lighted during the entire period.

After the departure of her assailants, Mrs. Padovani rearranged her clothing, released the imprisoned doctor and patient from the closet, and called the police. She was taken to Morrisania hospital for examination and treatment. Scientific tests revealed the presence of semen and spermatozoa on the clothing she wore at the time of the robbery. At the hospital she was interviewed by Lieutenant Lawrence Doherty of the Bronx sex crime squad, and gave a description of her assailant.

## II. THE INVESTIGATION

On the day after the crimes occurred, Mrs. Padovani at the 48th Precinct office was shown two trays of "mug shots," one was the sex tray—negro male, and the other the robbery tray—under five feet eight inches height. Each tray contained over a hundred photographs. She selected five, and then with respect to one of them requested Doherty to make a copy of it on which she could sketch a hood on it. After drawing the hood she made a positive identification of that suspect.

The police had no particular suspect in mind, and, as the trial court found, made no attempt to persuade the victim to select any particular picture.

After she had selected the picture (which turned out to be of defendant Kenneth Solomon) Doherty turned it over and retrieved the data relating to defendant, and subsequently located and arrested Solomon.

On October 17, Mrs. Padovani was notified of the arrest and called to the police station. While there she called her husband's attention to the photograph of defendant which had been placed on the bulletin with a thumb-tack. The arraignment did not take place that night, but on the following day defendant was arraigned. Doherty had the photograph in his hand on that occasion, but Mrs. Padovani does not remember his showing it to her. Perhaps she saw the picture again at the time of testifying before the grand jury, though it is her recollection that Doherty was off duty that day and that the prosecuting attorney did not show her any pictures.

1. Mrs. Glass and the taxi driver could not make an identification. The testimony of the patient, Henrietta Clark, was excluded, as although she picked out the defendant in a line-up she did so

on the basis of a photograph marked by Mrs. Padovani rather than on the basis of her recollection of the crime.

At the arraignment defendant was present and Mrs. Padovani could observe him. She signed the affidavit for the complaint. Doherty asked her if she had gotten a good look at the defendant and if he were the right man. She answered "Yes" to both questions.

Later Mrs. Padovani attended several lineups. At one on November 19, 1974, she identified one Clayton Smalls as one of the three participants in the crime. On January 16, 1975, three lineups were held. At the second one, Mrs. Padovani identified one Kenneth Anscombe as the gunman, but immediately retracted that identification, realizing that Anscombe was heavier than her assailant. Anscombe weighed 147 pounds, defendant 130. A third lineup was then held, composed of defendant and four other persons ranging from 146 to 195 pounds, and Mrs. Padovani identified the defendant.

At the *Wade* hearing[2] and at the trial Mrs. Padovani positively identified defendant.

Lieutenant Doherty also had Dr. Casseus view some photographs at the police station and later at the doctor's office. The doctor selected defendant's photograph, but it is not certain whether or not when he first looked at the pictures the copy with the hood drawn by Mrs. Padovani was included in the display, though he did certainly see the *photograph with the hood* at one time or another. At the *Wade* hearing Dr. Casseus could not be certain that defendant was the robber because in the courtroom defendant was not wearing a hood as the robber did. At the trial Dr. Casseus, after stepping down from the witness stand and looking closely at defendant, positively identified defendant as the gunman. He attributed his uncertainty at the *Wade*

hearing to lack of a good opportunity to see the defendant clearly.

## III. THE LAW

The case at bar being a collateral review by habeas corpus of a criminal conviction in state court, it is appropriate to begin consideration of applicable legal doctrine by recalling the fundamental principle that federal courts have no business interfering with state criminal proceedings unless there is established a violation of federally protected constitutional rights which amounts to deprivation of due process of law in one form or another.[3]

This is particularly true in a matter such as is here involved, where the judicial interference would negate the exercise by a jury of its traditional function of weighing evidence and determining the credibility of witnesses and the reliability of testimony. Our people's time-honored commitment to the policy of jury trial ranks high in our catalogue of constitutional safeguards, and should not lightly be disturbed in reliance upon dubious assumptions that judges can better determine the reliability of witnesses. *U. S. v. One 1976 Mercedes Benz 280 S*, 618 F.2d 453, 468–69 (7th Cir. 1980).

On the other hand it must be remembered that identification testimony is often the least reliable and most suspect type of evidence employed to convict a defendant in a criminal case. Legal scholars have often observed that most of the spectacular miscarriages of justice have been due to mistaken identification of a defendant as the perpetrator of a crime. *Jackson v. Fogg*, 589 F.2d 108, 110 (2d Cir. 1978); *U. S. v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967). Hence where the police procedures employed in effecting an identification are so impermissibly mislead-

2. This expression refers to a hearing held, as required in *U. S. v. Wade*, 388 U.S. 218, 242, 87 S.Ct. 1926, 1940, 18 L.Ed.2d 1149 (1967), to determine "whether the in-court identifications had an independent origin."

3. Under the "selective incorporation" theory, the Fourteenth Amendment is currently regarded by the Supreme Court as making applicable to the states under the due process clause, some of the substantive safeguards prescribed by the first ten Amendments with respect to federal action. See Henkin, " 'Selective Incorporation' in the Fourteenth Amendment," 73 Yale L.J. (November, 1963) 74. In the case at bar appellee thus invokes the Sixth Amendment right to counsel "for his defence" in "criminal prosecutions."

ing and suggestive as to give rise to a very substantial likelihood of irreparable misidentification, the courts may exclude the tainted testimony. *Simmons v. U. S.*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

Indeed, in some Circuits a special charge is required, directing the jury's attention to the need for alert scrutiny of the value of eyewitness identification testimony. *U. S. v. Barber*, 442 F.2d 517, 528 (3rd Cir. 1971).[4]

Many dramatic illustrations of the unreliability of such eyewitness testimony could be compiled. A recent example appeared in the New York Times of August 31, 1980. Under the heading "Guilty as Perceived" the item states:

> Seeing is believing, as Jeffrey Streeter ought to know. Last month, three eyewitnesses to a case of assault and battery identified Mr. Streeter as the perpetrator in a nonjury trial before Polk County (Fla.) judge Edward Threadgill, and Judge Threadgill found Mr. Streeter guilty. But the witnesses were mistaken, since Mr. Streeter was not the real defendant; he had agreed to sit in for him in a judicial prank conceived by Warren Dawson, attorney for the defendant, Marvin Lee Anderson. The point, of course, was to show that the eyewitnesses could not correctly identify Mr. Anderson. Last week, after letting Mr. Streeter stew a while, Judge Threadgill reversed the verdict and ordered the authentic Mr. Anderson to stand trial.[5]

Nevertheless, as a general rule it is necessary to rely on the traditional fact-finding procedure of entrusting to the common sense of the jury, under appropriate instructions, the sensitive issue of identification. Only where police or prosecutorial misconduct or ineptitude results in a high degree of probability that improperly suggestive procedures have caused irreparable and irreversible misidentification should courts interfere with the jury's exercise of its normal function as fact-finder charged with the responsibility of weighing evidence and determining the credibility and reliability of eyewitness testimony. As stated by the Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), "Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature."

In *Manson* the Court reiterated the factors for gauging reliability:

> We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-*Stovall* confrontations.[6] The factors to be considered are set out in *Biggers*. 409 U.S., at 199–200, 93 S.Ct., at 382. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confron-

---

**4.** *Four factors are stressed: (1) the opportunity of the witness to observe; (2) the degree of positiveness in the identification; (3) whether the testimony is weakened by prior failure to identify or inconsistent identification; (4) whether the witness is unshaken after cross-examination.*

**5.** The writer of this opinion, in a District Court criminal trial, once permitted a defense attorney to practice a similar stratagem. However, the witness correctly identified the defendant sitting among spectators at the back of the courtroom. In *Moore v. Illinois*, 434 U.S. 220, 230, 98 S.Ct. 458, 465, 54 L.Ed.2d 424 (1977), Justice Powell suggests that counsel could have

asked "that petitioner be seated with other people in the audience when the victim attempted an identification."

**6.** This is a reference to *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), "when we first gave notice that the suggestiveness of confrontation procedures was anything other than a matter to be argued to the jury." [*Neil v. Biggers*] 409 U.S. at 199, 93 S.Ct. at 382. The *Stovall* trilogy decided June 12, 1967, included *U. S. v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178.

tation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. [432 U.S. at 114, 97 S.Ct. at 2253]

As indicated in *Manson*, the *sedes materiae* for the specification of the factors to be weighed is found in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). The "central question" for determination, it was there held, is whether

under the "totality of circumstances" the identification was reliable even though the confrontation procedure was suggestive. [409 U.S. at 199, 93 S.Ct. at 382]

A similar catalogue of relevant considerations appears in *U. S. v. Wade*, 388 U.S. 218, 241, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149 (1967), including the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification.

It should be noted that in the case at bar there was really no attempt by the police to influence the identification by the witness. Hence the occasion for determining whether the in-court identification can be shown to be based upon independent sources other than the impermissibly suggestive influence does not really arise.[7] Nevertheless, upon scrutiny of Mrs. Padovani's testimony with respect to factors specified by the Supreme Court, I find that it measures up favorably.

The most plausible contention advanced by Solomon is that his appearance at arraignment was an "uncounseled show-up"

violative of his Sixth Amendment right to counsel as incorporated by the Fourteenth Amendment. It was stated in *U. S. v. Wade*, 388 U.S. 218, 224–25, 87 S.Ct. 1926, 1930–1931, 18 L.Ed.2d 1149 (1967), that the right to counsel is guaranteed at "critical" stages of a criminal prosecution, and that some types of arraignment (as in Alabama) where rights may be foreclosed if not then asserted, constitute critical stages of the prosecution. See also *Gilbert v. California*, 388 U.S. 263, 272, 87 S.Ct. 1951, 1956, 18 L.Ed.2d 1178 (1967) [using the phrase "post-indictment pre-trial lineup" as identifying a "critical stage"]; *Kirby v. Illinois*, 406 U.S. 682, 688–89, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972), and *Moore v. Illinois*, 434 U.S. 220, 224–31, 98 S.Ct. 458, 462–466, 54 L.Ed.2d 424 (1977) [showing that not indictment but "initiation of adversary judicial criminal proceedings" is the critical time].

The language in *Kirby* (406 U.S. at 689, 92 S.Ct. at 1882) that right to counsel attaches only "*at* or after the initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment, information, or *arraignment*" [italics supplied] could be taken to mean that if the prosecution began when the arraignment was completed the defendant should be represented by counsel during the entire course of the arraignment.

However, from a practical standpoint arraignment is ordinarily not a critical stage where advice of counsel is important but merely a formality or historical relic. As explained by Blackstone[8] at arraignment the defendant's name is called and he raises his hand. This is to identify the person brought into court as the person against whom the charges are being brought. It is also the time when the defendant "puts himself upon the country" or accepts trial by jury of his case.

---

**7.** In the case at bar only in-court identification is involved. The prosecution did not offer at trial any proof as to photographic or line-up identification, and defense counsel for tactical reasons did not go into that subject. Hence the distinction urged by Justice Marshall in his dissent in *Manson v. Brathwaite* (432 U.S. at 121–24, 97 S.Ct. at 2256–2258) has no pertinence here.

**8.** 4 Bl.Com. 322–29.

If the defendant refused to plead and put himself upon the country, he was subjected, under the harsh rules of the English common law, to *peine forte et dure*. He was laid on his back, naked to the waist, his limbs stretched and tied to the four corners of the room, and weights were placed on his chest, as heavy as he could bear, and heavier, "*till he died*, or (as anciently the judgment ran) *till he answered*." For the sake of their heirs, defendants would undergo this torture so as to prevent a conviction which would entail forfeiture of their estates. In 1772 *peine forte et dure* was abolished, and a refusal to plead treated as a plea of guilty; after 1827 as a plea of not guilty.[9]

The antiquarian ceremony of arraignment thus has little meaning for modern law. Our attention has not been called to any legal rights forfeited by a defendant under New York law if his counsel does not claim them at arraignment. Even if the doctrine of *Wade* and subsequent cases is applicable, there is no substantial ground for excluding Mrs. Padovani's in-court testimony. It was clearly based upon independent observation and admissible under the *Wade* rule as well as later leading cases such as *Neil v. Biggers* and *Manson v. Brathwaite*. As pointed out by Mr. Justice Blackmun (432 U.S. at 113, 97 S.Ct. at 2252) "The standard, after all, is that of fairness as required by the Due Process Clause of the Fourteenth Amendment" under "the totality of the circumstances." The crucial question is reliability.[10]

Particularly when the facts in the case at bar are scrutinized, it is plain that the "uncounseled show-up" at arraignment had no impermissible suggestive effect on the reliability of Mrs. Padovani's in-court identification. If there was any error it was harmless, under the doctrine of *Chapman v. California*, 386 U.S. 18, 22–24, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967).

Solomon, having been arrested in consequence of Mrs. Padovani's photographic identification, was naturally present at the arraignment, for otherwise there would have been a violation of the right of every defendant to be present at every stage of the proceedings. It was necessary for Mrs. Padovani to be there in order to execute the complaint. There was nothing improper or suggestive in detective Doherty's inquiry after she had had an opportunity to see the defendant: "Did you get a good look at him?" Upon her affirmative response he asked "Is that him?" and she replied "Yes."

It is obvious that this discussion was not an effort on Doherty's part to persuade Mrs. Padovani to identify Solomon. She could have answered "No" as readily as "Yes." She knew that Doherty was genuinely seeking information when he asked her the questions, that he wanted *her* truthful answers, not fabricated answers to suit *his* wishes.

She knew that her testimony was the crucial link connecting Solomon with the crime; the police did not attempt to influence her judgment or to bolster her conviction by informing her of the existence of other evidence of defendant's guilt (cf. 432 U.S. at 118, 97 S.Ct. at 2254 and 434 U.S. at 230, 98 S.Ct. at 465)—there was no other evidence of anyone's guilt. Mrs. Padovani, like the public generally, surely knew, too, that under our system of law a defendant is presumed innocent until duly found guilty—that regardless of any putative desires of the police her response was to be truthful and in accordance with her best recollection, and uninfluenced by any wishes or desires on Doherty's part to "nail" a particular suspect. But in fact Doherty had no suspect—he had merely located the suspect selected by Mrs. Padovani herself from an unsuggestive collection of some 200 photographs.

---

**9.** Donald Veal, *The Popular Movement for Law Reform 1640–1660* (1970) 27, 235.

**10.** This seems to be true whether the case involves due process *simpliciter* or "incorporation" of right to counsel, and whether a pre-trial identification or an in-court identification is involved. In the case at bar, as previously noted, only in-court identification is at issue. See note 7 *supra*.

Passing on from the confrontation at arraignment, we proceed to scrutinize Mrs. Padovani's testimony under the rubrics enumerated in *Neil v. Biggers* and *Manson v. Brathwaite, supra.*

1. *The opportunity to view the criminal at the time of the crime.* Mrs. Padovani had a good opportunity to view the criminal from the time the three men entered the office until they left. She was right beside the hooded assailant during the robbery in the doctor's office, and then in close contact during the rape. The premises were well lighted, and her eyesight was good.

2. *The degree of attention on the part of the witness.* Mrs. Padovani was certainly scrutinizing intently the gunman for he was brandishing a weapon, and alert attention to his behavior was an indispensable precaution for her safety. The robbery and other crimes perpetrated certainly constituted the most prominent event taking place in the doctor's office, and there were no competing attractions to divert her attention.

3. *The accuracy of her prior description of the criminal.* According to the description attributed in the police report to all the witnesses, the gunman was described as a black male, age 21, height 5′6″. Solomon was a black male, age 16, height 5′6″. Allowing for normal human errors in reporting and recording, this appears to be an adequately accurate description.

4. *The level of certainty displayed by the witness.* Mrs. Padovani indicated no doubt or hesitation in her identification. The only deviation from unwavering certitude is found in her temporary identification (at the second line-up on January 16, 1975) of Kenneth Anscombe (aged 18, height 5′6″) as the gunman. She immediately recanted this conclusion, however, upon realizing that Anscombe (weight 147 pounds) was heavier than her assailant (Solomon weighs 130 pounds).

Much is made in argument of this temporary aberration. It is contended that Mrs. Padovani meant that Anscombe was heavier than *Solomon,* that she was thinking of Solomon, the defendant she had seen at arraignment, whose picture she had seen several times, and that she had grown "accustomed to his face" and compared Anscombe with him rather than with the hooded rapist.

This argument seems to be straining at gnats, however; for there was no need for Mrs. Padovani to be thinking of pictures of Solomon when evaluating Anscombe's weight. No one could know better than she did whether her assailant was heavier or skinnier—for paraphrasing the poet Edna St. Vincent Millay (*The Harp Weaver and Other Poems*) she had had occasion "to bear his body's weight upon her breast." Her judgment as to the avoirdupois of her assailant was based, in Wigmore's phrase, upon "autoptic proference" and her own bodily senses rather than upon recollection in her mind's eye of the mug-shot of Solomon which had led to his arrest.

It is unfortunate that the police did not have the ingenuity to conduct a line-up containing both Anscombe and Solomon, but in any event it can not be said that Mrs. Padovani's level of certainty was substantially impaired. Her identification of Solomon was completely certain save for a fleeting instant, and she corrected immediately her temporary aberration.

5. *The time between the crime and the confrontation.* It was on the day immediately after the crime that Mrs. Padovani selected Solomon's picture from a field of 200.

When she first saw him in the flesh at the arraignment it was only eleven days since the crime. The line-ups were held three months and nine days after the crime. When Mrs. Padovani identified the defendant at the *Wade* hearing nine months and a day had elapsed since the offense occurred; and her identification at the trial took place a week later. These periods of time are consistent with a reliable identification, especially in view of the prompt recognition of defendant's photograph on the day following the robbery and rape.

Thus it is clear that there was no impermissible persuasion (or indeed any persua-

sion at all) exercised by law enforcement officials to influence Mrs. Padovani's identification of defendant. It was based on her own recollection of her assailant's appearance, and she promptly selected his photograph from among a large number in an admittedly unsuggestive procedure. Later developments did not diminish to any substantial degree the reliability of her in-court identification. Measured by the standards specified by the Supreme Court, her testimony withstands scrutiny. It was based on her own sensory recollections. She had ample opportunity to observe closely during a considerable period of time under good light. She selected the defendant as a suspect the very next day after the crime. Her identification was not substantially weakened by any inconsistent identifications except for a brief aberration, which she instantly corrected, based on her assailant's weight (which she had had a good opportunity to know at first hand). Her testimony properly was for consideration by the jury. (The testimony of Dr. Casseus was likewise admissible, but was merely corroborative or cumulative, and did not contribute materially to Solomon's conviction).

Hence, I respectfully dissent.