GWIN, District Judge,
concurring in judgment. MOORE, Circuit Judge, joins this opinion, making it the opinion of the court.
I concur in judgment in the opinion denying Grayer’s writ of habeas corpus. I write separately to discuss my concerns with the identification issue presented in this case. The issue is whether the Michigan Court of Appeals’ decision — that Mencer’s identifications were independently reliable — constitutes an unreasonable application of established precedent under AEDPA. In the end, I believe that this is a very close question. Mencer’s photographic identification was unquestionably suggestive. As to reliability, I disagree with the lead opinion’s analysis, which gives short shrift to the Biggers factors that undermine the reliability of Mencer’s identification. In contrast to the lead opinion, I believe that the first and third factors undermine reliability. However, because of the strict AEDPA standards, I conclude that it was not objectively unreasonable for the Michigan Court of Appeals to find that the admission of Mencer’s identification testimony was nonetheless independently reliable.

I. BACKGROUND

About one month after the carjacking, Parole Officer Junkin showed Jane Mencer two photographs. Both photographs were of Grayer. Both were dated September 30, 1993 and had alias names of Grayer on the photographs. Both photographs had captions saying, “Michigan Department of Corrections.”
At trial, Grayer’s sole defense was that of misidentification, contending that Menc *444 er mistakenly identified Grayer as the carjacker and that Mencer’s viewing the two photographs of Grayer tainted her subsequent identifications. During his opening statement, counsel for Grayer argued that “the power of suggestion is great,” referring to Junkin showing Mencer two photographs of Grayer. Counsel for Grayer continued, “Ms. Mencer, before identifying my client, had an opportunity to discuss this ... with one other person and look at one photograph, and that photograph being of my client, Mr. Grayer.”
At trial, the victim did not identify Grayer as the carjacker. Nor could the victim identify the knife as the one used during the attack.
Mencer testified at trial. She was the only witness who identified Grayer as the carjacker because the victim could not make the identification.

II. DISCUSSION

A. Suggestiveness

The pre-trial photographic procedure in showing Mencer only two photographs, when both photographs were of Defendant Grayer, was impermissibly suggestive. The Supreme Court has long cautioned against photographic identifications in which the police display only one photograph. See Simmons v. United States, 390 U.S. 377, 383, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (“This danger [that the witness may make an incorrect identification] will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw.”).
The remaining issue is whether Mencer’s subsequent identifications were otherwise reliable, meaning that her identifications were reliable independent of the impermissibly suggestive pre-trial photographic procedure. If Mencer’s identifications are rehable, they will be admissible even though the photographic procedure was suggestive. See Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Carter v. Bell, 218 F.3d 581, 605 (6th Cir.2000).

B. Reliability

In judging reliability, we consider the totality of the circumstances, including the factors described in Manson and Biggers: (1) the opportunity of the witness to view the defendant at the initial observation; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the defendant; (4) the level of certainty shown by the witness at the pretrial identification; and (5) the length of time between the initial observation and the identification. Manson, 432 U.S. at 114, 97 S.Ct. 2243; Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). We weigh these factors against any “corrupting effect of the suggestive identification,” which suggests that the factors should weigh more in favor of reliability when the witness views an extremely suggestive a pre-trial photographic procedure. Manson, 432 U.S. at 114, 97 S.Ct. 2243. In conducting this analysis, I am mindful that “[s]ocial-seience research has demonstrated the unreliability of an identification made after the display of a single photograph.” Connie Mayer, Due Process Challenges to Eyewitness Identification Based on Pretrial Photographic Arrays, 13 Pace L.Rev. 815, 828-29 (1994).
In applying the Biggers factors, the lead opinion concludes that the first, second, fourth, and fifth factors “clearly demonstrate a reliable and independent identification.” The lead opinion admits that the third factor undermines reliability, but finds that this factor alone does not “render an identification unreliable.”
*445 I write separately because I disagree with the lead opinion’s analysis of the Biggers factors. I believe that the first and third Biggers factors undermine the reliability of Mencer’s identification, and I have concerns about the reliability of Mencer’s identification. However, after considering AEDPA as it applies to this habeas petitions, I find the Michigan Court of Appeals’ conclusion was not objectively unreasonable.

1. Opportunity to View

As to the first factor, the lead opinion concluded that this factor supports reliability because “Mencer had the opportunity to view Grayer’s profile and face for one to two minutes at the red light.” After reviewing the record, I find insufficient support for this finding. After considering the time of day, the ability to see only the carjacker’s profile except for a short frontal view, the distance between the cars, the need to view through the interior length of the carjacked car, I conclude that Mercer did not have a good opportunity to view the carjacker under the circumstances of the car chase.
Mencer, a fifty-one year old woman, was driving a 1996 Grand Prix. Mencer did not see the carjacker until after he was seated in the Neon. During most of the pursuit, Mencer viewed the carjacker from behind since her car was trailing his. While she pursued him, she was behind him, and she could, at best, see the back of his head.
Mencer’s only opportunity to view the carjacker, either his face or his profile, occurred while they were stopped at a red light, and Mencer was to the right of the carjacker. But even while they were stopped at a red light, in looking at the carjacker, Mencer needed to look through the length of the carjacked vehicle (hardtop, like hers) to observe the offender. Mencer viewed the carjacker on an early September evening after 7:45, across the distance separating the cars and through the interior of the Neon.
The lead opinion suggests that Mencer viewed the carjacker’s face and profile for several minutes.[1] However, the record instead shows that she observed his profile for several minutes, but that she saw his face only once when the carjacker looked at her. Mencer testified that “[a]t one point” he looked at her and she saw his face, but otherwise he looked straight ahead and she saw his profile. While the record does not include how much time the carjacker looked at Mencer, her testimony suggests that it was rather short, as he only looked at her once while they were stopped at the red light. At most, Mencer viewed his face for only a short period.
Mencer testified regarding the clothes that the carjacker was wearing. The lead opinion credits Mencer’s statement that she could “look right down and look at the clothing” because her “car was bigger than that car” during the pursuit. Although the lead opinion accepted Mencer’s assertion that she could see the carjacker’s face and body because her car was higher than the Neon, both Mencer and the carjacker were driving sedans, and they would have been at approximately the same level. Given that she only saw him while he was seated in the car, it is not clear how she estimated that he was 5'9" — 5'10". From Mencer’s vantage point, it is implausible that Mencer could have seen the pants that the carjacker was wearing. It is also unlikely that she could see the stripes on the left *446 sleeve of his jacket since she was following behind him during the chase and her car was to the right of the Neon when they were stopped at the red light.
Based upon the circumstances, the record shows that, on the whole, Mencer did not have a good opportunity to view the carjacker, which weighs against the reliability of the identification.

2. Whether the Witness was Attentive

As to the second factor, the lead opinion finds that Mencer had a “high degree of attention.” Although some circumstances undermine Mencer’s reliability, I agree that Mencer had a high degree of attentiveness for the brief time when she looked at the carjacker while she was stopped at the red light.
In this case, Mencer’s testimony suggests that she had a high degree of attentiveness for the brief time when she looked at the carjacker while she was stopped at the red light. Mencer testified that “I looked at him very well when was inside of the Neon. I purposely looked to see what I could remember about him. That’s exactly the way I did it in case that I see him again.” Mencer suggests that she was very attentive, which tends to support reliability. Although attentive, Mencer had little chance to observe the perpetrator during the pursuit.
Mencer did not witness the carjacking itself. Instead, her attention was focused on Trecha running from the car. However, she suspected that Trecha was carjacked, and she pursued the suspected carjacker with a reason to pay attention, even though she did not witness the crime itself. Mencer’s pursuit of the carjacker was her only encounter with the carjacker.
During the pursuit, Mencer pursued the carjacker in her car for five or six miles, sometimes at speeds up to forty-five miles per hour. During the pursuit, Mencer largely drove behind the Neon and only came close to the Neon when they were stopped at the red light, and she was still a car length’s distance away. At the red light, Mencer closely focused on the carjacker although he mostly looked straight ahead.
The lead opinion concludes that “Mencer did not suffer from fear or stress during this incident, as crime victims and witnesses often do.” However, Mencer’s testimony suggests that she was somewhat agitated while she was pursuing him. For example, she testified that she was yelling at others during the pursuit and hollering at the carjacker while they were stopped at the red light.
Although some circumstances suggest that she was distracted, we conclude that Mencer displayed a high level of attentiveness during her opportunity to view the carjacker, which generally supports reliability of her identification.

3. Accuracy of the Witness’s Prior Description

As to the third factor, the lead opinion admits that Mencer’s prior description was inaccurate, but concludes that the inaccuracies do not “necessarily render an identification unreliable.” I agree that Mencer’s prior description is somewhat inconsistent with Grayer’s physical attributes. Although these inconsistencies were not major, the inconsistencies further undermine the reliability of Mencer’s identification, especially since Mencer did not have a good opportunity to view the carjacker.
In her description to the police, Mencer described the carjacker’s height, age, complexion, hair, facial hair, clothing, and build. Mencer’s description was somewhat inconsistent with Grayer’s physical attributes. For example, Grayer is actually 5'6", even though Mencer described the suspect *447 as 5'9" to 5'10". Grayer was 28, although Mencer described him as 20-25. Although both Mencer and the victim described the carjacker as having a “thin build,” Grayer’s basic information sheet describes him as having a medium build. Additionally, Mencer’s described the carjacker as being “dark skinned,” but Grayer’s basic information sheet describes him as having a medium complexion. Finally, Mencer’s description of the carjacker’s facial hair was inconsistent with Grayer’s facial hair. In her description to the police, Mencer stated that the carjacker had a beard. At the Wade hearing, she testified that Grayer’s “facial hair was big, it was grown out more.” However, the police record from the live lineup describes Grayer as only having a mustache and goatee. Mencer also described the clothing that the carjacker was wearing, although it is not clear how she was able to view the pants that he was wearing since she only saw him while he was seated in the automobile.
Elsewhere, the lead opinion emphasizes that Mencer’s description of the carjacker was similar to the victim’s description. However, the record shows that the victim was unable to identify the carjacker.[2]
The inconsistencies between Mencer’s description and Grayer’s physical attributes suggests that Mencer’s prior description was at least partially inaccurate. This further undermines the reliability of Mencer’s identification.
A Level of Certainty
As to the fourth factor, the lead opinion concluded that Mencer’s identification was made with certainty. I agree with this conclusion as to this factor. However, I disagree with the lead opinion’s statement that Mencer’s identification at the live lineup was made independently of the photo array. This statement assumes the question at issue in the Biggers analysis, namely whether Mencer’s identifications were independently reliable from the impermissibly suggestive pre-trial photographic procedure.
Although level of certainty is a factor in determining reliability of an identification, courts proceed with caution once a witness has seen a single photograph of a suspect. The Supreme Court has observed that, after viewing a single photograph, “the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification.” Simmons v. United States, 390 U.S. 377, 383-84, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Other courts have recognized that “[d]eterminations of the reliability suggested by a witness’s certainty after the use of suggestive procedures are complicated by the possibility that the certainty may reflect the corrupting effect of the suggestive procedures.” United States ex rel Kosik v. Napoli 814 F.2d 1151, 1159 (7th Cir.1987). A defendant’s right to due process includes the “right to avoid having suggestive methods transform [an identification] that was only tentative into one that is positively certain.” Solomon v. Smith, 645 F.2d 1179, 1185 (2d Cir.1981). Although the level of certainty is a Biggers factor, “[m]any [social science] studies demonstrate that there is no correlation between the confidence of the witness and the accu *448 racy of the identification.” Connie Mayer, Due Process Challenges to Eyewitness Identification Based on Pretrial Photographic Arrays, 13 Pace L.Rev. 815, 845 (1994).
Keeping these considerations in mind, Mencer exhibited a high level of certainty, which, under established precedent, supports the reliability of her identifications.

5. Length of Time

Under the fifth factor, the lead opinion concluded that the length of time between the initial observation and Mencer’s identifications “was not so long to create a risk of erroneous identification.” I agree with the lead opinion that this factor supports reliability of Mencer’s identification because the time elapsed in this case was no more than several months.

C. AEDPA

Before the state courts, Grayer made the argument that the identification methods were constitutionally impermissible. The Michigan Court of Appeals denied the assignment of error and affirmed Grayer’s convictions.
Where a state court adjudicates a petitioner’s constitutional claim on the merits, AEDPA governs subsequent federal habeas actions. E.g., Smith v. Stegall, 385 F.3d 993, 997-98 (6th Cir.2004), cert. denied, — U.S. —, 125 S.Ct. 2299, 161 L.Ed.2d 1094 (2005). Here, Grayer does not contend that the Michigan Court of Appeals used a standard of law contrary to established Federal law, as determined by the Supreme Court. Instead, Petitioner Grayer maintains that the Michigan court unreasonably applied controlling federal law. An “unreasonable application” occurs when “the state court identifies the correct governing legal principle from [the Supreme] Court’s decisions but unreasonably applies that principle to the facts of the prisoner’s case.” Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).
A state adjudication is not “unreasonable” “simply because [a federal habeas court] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.” Williams, 529 U.S. at 411, 120 S.Ct. 1495. Instead, the petitioner must show that the state court’s application of established Supreme Court precedent was objectively unreasonable. E.g., Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam).
In this case, the pre-trial photographic procedure, in showing Mencer two photographs of Grayer, was suggestive. Some of the Diggers factors undercut the reliability of the identification while others support it. The Michigan court faced a close question. Taken as a whole and mindful that in undertaking habeas review, AED-PA requires us to afford wide latitude for the state court’s determinations on the merits, I find the state court’s determination was not unreasonable.
Accordingly, I conclude that the Michigan Court of Appeals’ decision finding that Mencer’s subsequent identifications were independently reliable was neither contrary to nor involved an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d). For the foregoing reasons, I concur in judgment.
Judge Moore joins this opinion, making it the opinion of the court.

. For example, the lead opinion states that "Mencer examined Grayer's face for one to two minutes as their cars sat side by side.” At best, this sentence is misleading — it fails to distinguish the several minutes when Mencer observed the carjacker’s profile from the brief moment in which Mencer observed the carjacker’s face.

. At trial, the victim stated, "once I saw the knife, I never looked at him again.” In describing her attacker, the victim indicated that "I had just impressions because I had not deliberately looked at the man.” She described the man as a black male about twenty years old, 5'8" tall with a thin build, medium complexion, with short curly hair, and he had a beard as if he had not shaved for a day or two. However, the victim never had a front view of the suspect, and she did not look at him again after he brandished the knife.